# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

JANE DOE, a minor, by her parents and next friends JOHN DOE and JUDY DOE, JOHN DOE, in his individual capacity, and JUDY DOE, in her individual capacity,

      *Plaintiffs*,

    v.

ROBERT PIRAINO, MUSIC CITY FENCING CLUB, INC., and UNITED STATES FENCING ASSOCIATION,

      *Defendants*.

FILE NO. 3:22-CV-00560

U.S. DISTRICT JUDGE
ALETA A. TRAUGER

JURY DEMAND

## FIRST AMENDED COMPLAINT

1.    Plaintiffs bring this action against Defendants for intentional infliction of emotional distress; assault and battery; negligence; violations of the federal Trafficking Victims Protection Act (18 U.S.C. §§ 1589 and 1591); and violations of the federal child pornography laws (18 U.S.C. § 2251). Plaintiffs' claims arise from Defendant Robert Piraino's sexual abuse of Plaintiff Jane Doe, a minor.

## PARTIES

2.    At the time the original complaint was filed, Plaintiff Jane Doe was a sixteen-year-old girl. She is proceeding in this lawsuit by and through her parents as next friends. She and her parents have filed this complaint pseudonymously because the sexual abuse committed against her by Defendant Piraino is a highly personal and sensitive subject. Defendants already know Doe's true identity. To the extent Defendants claim not to know Doe's true identity, Plaintiffs are willing to disclose her identity subject to a protective order.

1

3. Plaintiff John Doe is Jane Doe's father. He is proceeding in this lawsuit both as next friend of Jane Doe and in his individual capacity.

4. Plaintiff Judy Doe is Jane Doe's mother. She is proceeding in this lawsuit both as next friend of Jane Doe and in her individual capacity.

5. Defendant Robert Piraino is a former fencing coach. He is the owner, principal, and former head coach of Defendant Music City Fencing Club, Inc. At the time the initial complaint was filed, he resided at the Davidson County Male Correctional Development Center, 5113 Harding Place, Nashville, Tennessee 37211. He may be served with process at the Correctional Development Center, or wherever he may be found.

6. Defendant Music City Fencing Club, Inc. (from now on, "Music City Fencing") was at all times relevant to this Complaint, according to Defendants, "Tennessee's #1 Olympic fencing club." It is a Tennessee corporation whose principal place of business is located at 2543R Lebanon Pike, Nashville, Tennessee 37214. Music City Fencing may be served with process at its principal place of business or through its registered agent, Defendant Piraino.

7. Defendant United States Fencing Association (from now on, "USA Fencing") is the national governing body for the sport of fencing in the United States. It is a Colorado non-profit corporation whose principal place of business is located at 210 USA Cycling Point, Suite 120, Colorado Springs, Colorado 80919. USA Fencing can be served with process at its principal place of business or through its registered agent, Donald Alperstein.

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction because this suit raises claims under federal law, and the state-law claims are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. §§ 1331; 1367(a).

2

9.     The Court has personal jurisdiction over Defendant Piraino because he is a resident of Tennessee.

10.     The Court has personal jurisdiction over Defendant Music City Fencing because it is a Tennessee corporation with its principal place of business in Tennessee.

11.     The Court has personal jurisdiction over Defendant USA Fencing because, as explained in further detail below, USA Fencing has transacted business in Tennessee and has caused a tortious injury in Tennessee.

12.     The Court's assertion of jurisdiction over USA Fencing is permitted by the United States Constitution because USA Fencing has purposefully availed itself of the privilege of doing business in Tennessee and this lawsuit arises out of and relates to its contacts with Tennessee. USA Fencing has chartered a Tennessee Division that oversees fourteen Tennessee-based fencing clubs. Hundreds of Tennessee residents participate in these clubs as dues-paying members of USA Fencing. USA Fencing advertises in Tennessee, and regularly holds fencing tournaments, meetings, camps, and other events in the state. This lawsuit arises out of and relates to the foregoing contacts because it involves the sexual abuse of a Tennessee resident in the course of her participation in fencing activities in Tennessee as a member of USA Fencing.

13.     Venue is appropriate in the Middle District of Tennessee because a substantial part of the events giving rise to this lawsuit occurred in and around Nashville. 28 U.S.C. § 1391(b)(2).

## FACTS
### Defendant USA Fencing

14.     The Amateur Sports Act of 1978, Pub. L. 95-606 (Nov. 8, 1978), created the United States Olympic Committee (now the United States Olympic and

3

Paralympic Committee) and granted the committee authority to recognize a national governing body for each Olympic sport. Shortly thereafter, Defendant USA Fencing was recognized as the national governing body for the sport of fencing.

15. As the national governing body, USA Fencing is responsible for, among other things, promoting the sport of fencing in the United States, determining the standards by which athletes will be chosen to represent the U.S. in international competition, maintaining a national membership system for students, coaches, referees, and other members of the fencing community, and creating a common set of rules and policies that govern members and clubs when participating in fencing-related activities.

16. Membership in USA Fencing is necessary for anyone who wishes to pursue competitive fencing or a career as a fencing coach. Fencers, coaches, and referees must be members of USA Fencing in order to compete or otherwise participate in USA Fencing-sanctioned tournaments, camps, and other events.

17. USA Fencing has more than 30,000 dues-paying members and approximately 700 approved fencing clubs in the United States.

18. USA Fencing is a multi-million-dollar business. Its total revenue was $9,867,430 for 2017-2018, $11,150,296 for 2018-2019, and $8,422,991 for 2019-2020.

19. Substantial parts of USA Fencing's operations are organized by region. There are six regions. Tennessee is in Region 6, which also includes Alabama, Georgia, Delaware, D.C., Florida, Maryland, Mississippi, North Carolina, South Carolina, Virginia, and West Virginia. These states collectively represent thousands of USA Fencing members.

20. USA Fencing also delegates certain operations to individual divisions, which normally correspond geographically to a single state. Sometime prior to the events giving rise to this lawsuit, USA Fencing chartered its Tennessee Division. The Tennessee Division is responsible for, among other things, implementing and

4

enforcing policies and procedures adopted by USA Fencing's national office, organizing qualifying events for regional and national tournaments, sanctioning tournaments held by local fencing clubs, and holding regular meetings of the Tennessee membership. During the time relevant to this lawsuit, the Tennessee Division included 14 clubs, more than 300 members, and held 10-15 tournaments annually in Tennessee.

**Sexual Abuse in the Fencing Community**

21. Like many organizations with substantial youth membership, USA Fencing has struggled to prevent sexual assault, exploitation, and misconduct from occurring within the sport.

22. Perhaps the highest profile incident involving a fencing coach sexually abusing one of his students was the case of Mauro Hamza, who USA Fencing suspended in 2014 after credible allegations that he began a sexual relationship with a fencer when she was underage.[1]

23. Sexual assault allegations against Alen Hadzic, the Olympic fencer who was the subject of protest by his fellow fencers at the 2020 Tokyo Olympics, were initially made in 2013 and 2014, and USA Fencing was informed of the allegations at that time. As widely reported in the media, the men's Olympic fencing team wore pink masks in solidarity with women in fencing who have been sexually abused and in protest of Mr. Hadzic's inclusion on the men's Olympic fencing team.

24. In October 2021, in response to outrage among the membership at the perceived ousting of the member elected president of USA Fencing's board, an individual who had been pushing for reforms and transparency in USA Fencing's policies and procedures relating to sexual abuse, USA Fencing's Chairman released a video in which he stated that "it seems like every month a fencing coach gets

---

1   The words "underage" and "young," as used in this Complaint, refer to individuals who are under 18.

arrested for sexually assaulting a minor." His statement was accurate. In the last six months of 2021 alone, six USA Fencing members including Piraino were arrested or made ineligible to fence due to sexual misconduct, four of which were coaches who had sexually assaulted minors.

25. These incidents are part of a systemic problem within the sport. Based on a survey published in March 2018 on the prominent fencing blog, "The Fencing Coach," nearly 20% of women in the fencing community (41 out of 218 respondents) had been sexually assaulted by another member of the fencing community.

26. On September 27, 2021, USA Fencing's CEO Kris Ekeren resigned after seven years of service in the position. Her resignation came amid mounting pressure over the mishandling of complaints relating to sexual abuse, and was followed by a mass exodus of staff including the director of communications, general counsel, financial director, senior national events manager, sports performance manger, human resources director, and others.

27. USA Fencing's sexual-abuse problem came to light as scandals involving similar conduct were publicly unfolding in USA Gymnastics, USA Taekwondo, the Boy Scouts of America, and the Roman Catholic Church.

28. Indeed, USA Fencing acknowledges on its website that youth sports "can be a high-risk environment for . . . child physical and sexual abuse."[2]

### SafeSport

29. In 2017, the U.S. Olympic and Paralympic Committee decided that the sexual-abuse crisis in Olympic sports was out of control and therefore established a separate entity to support the national governing bodies, including USA Fencing, in preventing and responding to sexual abuse. The Committee chartered the U.S. Center for SafeSport ("SafeSport"). SafeSport has two core functions. The first is to

---

2    "FenceSafe is USA Fencing's Commitment to Safety," https://www.usafencing.org/fencesafe.

6

investigate and resolve reports of misconduct, including complaints of sexual abuse. The second is to provide the national governing bodies and their members with policies, procedures, best practices, training materials, and educational opportunities relating to the prevention of sexual abuse. SafeSport went online on March 3, 2017. The national governing bodies, including USA Fencing, agreed at that time to be bound by policies and procedures issued by SafeSport.

30. At that point, however, the rate of sexual abuse in Olympic sports had become so alarming that Congress intervened by passing the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act, which was signed into law on February 14, 2018. Pub. L. 115-126. The Act codified SafeSport's functions into federal law. It granted SafeSport authority to investigate reports of sexual misconduct in Olympic sports and required that SafeSport "establish mechanisms that allow for the reporting, investigation, and resolution … of alleged sexual abuse … ." Pub. L. 115-126, Sec. 202(a)(4). The Act further required that the national governing bodies comply with policies and procedures issued by SafeSport. *See* 36 U.S.C. §§ 220524, 220541(b).

31. Not long after it was established, SafeSport was overwhelmed with reports of abuse. By the end of 2018, SafeSport had received more than 1,800 reports. On May 23, 2018, the then-President and CEO of SafeSport testified before Congress that SafeSport was receiving more reports of abuse than it had resources to investigate. The number of reports skyrocketed to 2,770 in 2019 alone. In response, Congress increased SafeSport's funding to $20 million per year. P.L. 116-189, Sec. 8(g)(1)(a).

32. Pursuant to its authority to investigate and resolve complaints of sexual abuse, SafeSport adopted in 2017, and has subsequently amended, its "SafeSport Code for the U.S. Olympic and Paralympic Movement." The SafeSport Code sets forth procedures for the reporting, investigation, and resolution of complaints relating to

abuse, including child sexual abuse, in Olympic sports. While the national governing bodies are required to refer complaints of sexual misconduct to SafeSport, the Code nevertheless reserves to the national governing bodies substantial jurisdiction and authority to adopt and implement policies and procedures relating to allegations of sexual misconduct and abuse. It explicitly advises the national governing bodies that, before SafeSport asserts jurisdiction over a case, they have "the authority to implement necessary and/or appropriate measures, up to and including a suspension, to address any allegations of misconduct."[3]

33.     Under the SafeSport Authorization Act, SafeSport is also required to "develop training, oversight practices, policies, and procedures to prevent the abuse, including emotional, physical, and sexual abuse, of amateur athletes participating in amateur athletic activities through national governing bodies … ." 36 U.S.C. § 220541(a)(1)(C). Pursuant to this grant of authority, SafeSport adopted in January 2019, and has subsequently amended, its Minor Athlete Abuse Prevention Policies ("MAAPP"). MAAPP sets forth training requirements relating to the prevention of child abuse for members participating in Olympic sport, and prevention policies focused on limiting one-on-one interactions between adults and minors. The stated purpose of MAAPP is to "assist [the national governing bodies] in meeting their obligations under federal law … ."[4] In adopting MAAPP, however, SafeSport explicitly advised the national governing bodies that MAAPP only sets forth minimum requirements and that a national governing body retains discretion to adopt and implement additional restrictions beyond those set forth in MAAPP.

---

3    U.S. Center for SafeSport, "SafeSport Code for the U.S. Olympic and Paralympic Movements," p. 2 (version effective April 15, 2019).
4    U.S. Center for SafeSport, "Minor Athlete Abuse Prevention Policies" (January 23, 2019).

34.     USA Fencing has adopted its own policies and procedures relating to the prevention of abuse and misconduct in fencing. These include a fencing-specific MAAPP, Member Codes of Conduct, and a background-check policy.

35.     USA Fencing represents to young fencers and their parents that its policies and procedures demonstrate a "commit[ment] to creating a safe and positive environment for athletes' physical, emotional and social development, and to ensuring that it promotes an environment free of misconduct."[5] USA Fencing knows and intends for young fencers and their parents to rely on representations like this when deciding whether to become dues-paying members of USA Fencing.

36.     In short, USA Fencing has been aware for years of the risk that an underage fencer could be sexually abused by a coach or other adult. This risk was so well-known that the U.S. Olympic and Paralympic Committee and the federal government chartered and funded a national institution whose sole purpose is to assist USA Fencing and its fellow governing bodies in preventing sexual abuse. On top of the substantial public support it received, USA Fencing retained wide discretion and authority to implement its own abuse-prevention measures. It undertook to develop policies and procedures relating to sexual misconduct and abuse, which it advertised to the public as demonstrating a commitment to protecting young fencers. Thus was the state of affairs when the events giving rise to this lawsuit occurred.

### Defendant Piraino

37.     Before he was arrested in August 2021 for sexually abusing Jane Doe, Defendant Piraino was, thanks to USA Fencing, one of the most prominent, influential, and lauded fencing coaches in the country.

38.     At all times relevant to this lawsuit, Piraino was a USA Fencing member coach. Member coaches are authorized by USA Fencing to supervise and instruct

5   "FenceSafe is USA Fencing's Commitment to Safety," https://www.usafencing.org/fencesafe.

athletes at USA Fencing-approved clubs and at USA Fencing-sanctioned events and activities. USA Fencing represents to the public that its member coaches receive regular SafeSport training, are subject to regular background screening, and are covered by a liability insurance policy provided by USA Fencing that includes coverage for injuries caused by sexual molestation and abuse.

39. Around 2014, Piraino started the Music City Fencing Club in Nashville. Beginning in 2017, Defendant Music City Fencing was the corporate entity under which the Music City Fencing Club operated.

40. Music City Fencing was, at all times relevant to this lawsuit, a USA Fencing-approved premium member club. As a premium member club, Music City Fencing was listed on USA Fencing's website, was authorized to hold itself out to the public as a USA Fencing-approved club and to use the USA Fencing logo, was authorized to hold USA Fencing-sanctioned tournaments, camps, and other events, and was given access to various resources provided by USA Fencing to assist with fencing instruction, promotional efforts, and fund raising.

41. Piraino was the sole owner, officer, and director of Music City Fencing. He was responsible for the management of the company and made all decisions relating to finances, personnel, leases, equipment acquisitions, and policies and procedures governing the company's day-to-day operations, including the adoption, implementation, and enforcement of the company's policies and procedures relating to the prevention and detection of sexual abuse.

42. USA Fencing knew that Piraino exercised this authority over Music City Fencing, because the club membership application requires clubs to disclose their owners and principal officers to USA Fencing.

43. Piraino had complete control over the operations and management of Music City Fencing. Music City Fencing did not place any limits on Piraino's authority or ability to act on behalf of the company.

10

44.    Under Piraino's leadership, Music City Fencing became the premier fencing club in Middle Tennessee. The club routinely qualified large numbers of students to regional and national competitions, including the Junior Olympics, and was known around Nashville for providing high-level fencing instruction. For a young fencer in Nashville who wanted to pursue a college or Olympic fencing career, there was no genuine alternative to Music City Fencing.

45.    Piraino's influence within USA Fencing was not limited to his club, or even to the Nashville area. Beginning in 2014, he also acted as Chair of USA Fencing's Tennessee Division. The Tennessee Division is an administrative unit of USA Fencing and is operated under the same corporate entity as USA Fencing. The Division oversees all aspects of Olympic fencing in Tennessee, including implementation and enforcement of policies relating to sexual misconduct and abuse. According to USA Fencing, its divisions carry out tasks that are integral to the functioning of USA Fencing as a national organization, so much so that USA Fencing could not survive if its divisions were eliminated.[6]

46.    The Tennessee Division is governed according to an Operating Guide issued by USA Fencing. Under the Guide, the Division Chair is granted "overall responsibility for the smooth running of the division" and is "ultimately" responsible for the Division's work.[7] As Division Chair, Piraino's responsibilities included: coordinating the work of the Division's officers and executive committee; serving on the executive committee and casting the tie-breaking vote in executive-committee decisions; enforcing applicable USA Fencing policies and rules, including policies and rules relating to sexual misconduct and abuse such as those set forth in USA Fencing's Operations Manual and Athlete Handbook; serving as the public face of the Division; serving as the Division's liaison with USA Fencing's national office; and

6    USA Fencing, "Division Operating Guide," p. 5 (Updated February 2017).
7    *Id.* at 10.

11

serving as the Division's liaison with other divisions, as well as with other sporting organizations.

47.     Piraino, with USA Fencing's knowledge and assent, became the most powerful person in the Tennessee fencing community. But his authority and influence in the sport were not even limited to Tennessee. Sometime before he started abusing Jane Doe, USA Fencing hired Piraino as its Region 6 Coordinator. Regional Coordinator is a two-year position for which candidates are selected by USA Fencing through a competitive application process. As Regional Coordinator, Piraino's responsibilities included organizing and managing regional tournaments, and serving as a liaison between USA Fencing's national office and the thousands of members, parents, club owners, and event organizers in the twelve states comprising Region 6.

48.     In addition to granting him increasing levels of responsibility and authority within the organization, USA Fencing publicly commended Piraino for being an excellent, safe coach and ambassador for the sport.

49.     In 2018, USA Fencing gave Piraino's club, Music City Fencing, the "Club of Excellence" award. The club won this award in the category of Membership Programming, which recognizes the club's efforts in the areas of "[m]ember recruitment, retention and programming dedicated to creating a positive culture … ."[8]

50.     In 2019, USA Fencing again gave Music City Fencing the Club of Excellence award, this time in the category of Youth Programming, which recognizes clubs "who excel in recruiting and retaining fencers under the age of 18" and "clubs who create a positive environment that young people want to participate [sic], regardless of their fencing ability."[9]

---

8     "Club of Excellence Program," https://www.usafencing.org/club-of-excellence.
9     *Id.*

51.     In 2020, Music City Fencing won the Club of Excellence award for the third year in a row, a feat which has not been achieved by any other club in the history of the sport. This time, the club won the award in the category of Diversity, Equity, and Inclusion, which "celebrates those clubs who have had significant success in designing programs for people with disabilities, female fencers, economically disadvantaged fencers and any other underrepresented group."[10] Specifically, USA Fencing granted Piraino's club its "diversity, equity, and inclusion" award on the basis that Piraino was developing programming and creating a positive culture that would attract young girls to his club and to the sport of fencing generally.

52.     Also in 2020, Piraino received USA Fencing's "Spirit of Sport" award. According to USA Fencing, this award "focuses on the ideals that define the sport of fencing, including commitment, dedication, sportsmanship and character." Its purpose is to "recognize the incredible individuals making a positive impact on the fencing community."[11]

53.     USA Fencing publicly promotes the winners of its awards, including the Club of Excellence award and the Spirit of Sport award, through its website and other materials. In doing so, it is representing to the public that it has investigated and has direct knowledge of the award winners and their behavior. Further, USA Fencing knows and intends that award winners will use awards like the Club of Excellence award and Spirit of Sport award to promote themselves to young fencers and their parents. It further knows and intends that young fencers and their parents will rely, at least in part, on these awards when choosing which clubs to attend and which coaches to seek instruction from.

54.     At all times relevant to this lawsuit, USA Fencing authorized and allowed Piraino to act as its agent.

---

10  *Id.*
11  "Spirit of Sport – About the Program," https://www.usafencing.org/spirit-of-sport.

55. USA Fencing exercised control over the details and the manner in which Piraino performed his work as a USA Fencing member coach, owner and head coach of a premium member club, Division Chair, and Regional Coordinator. Piraino's conduct in these roles was governed by numerous rules, directives, policies, manuals, codes of conduct, and trainings, including its Operations Manual and Athlete Handbook (which collectively set forth USA Fencing's organizational structure, the membership system and criteria for membership, how competitions are organized, and rules and procedures for competitions), Member Codes of Conduct, Division Operating Guide, MAAPP, and SafeSport policies, the violation of which could subject Piraino to sanctions up to and including removal from any one of these positions and removal from the sport.

56. USA Fencing intended for Piraino to act on its behalf in dealing with young fencers and their parents. The roles and responsibilities for the Regional Coordinator position include acting as a liaison between USA Fencing's national office and the members in the region. The Division Chair serves as the "public face" of the Division and acts as a liaison between USA Fencing's national office and the Division membership. Regional Coordinators are provided with USA Fencing apparel to wear at tournaments and other events so as to symbolize their authority to act on USA Fencing's behalf. Additionally, Piraino had authority to organize and manage meetings, tournaments, camps, and other USA Fencing-sanctioned events. At these events, the fencers, parents, referees, and vendors who interacted with Piraino believed, correctly, that he was acting as a representative of USA Fencing.

57. Piraino, in his roles as owner and head coach of Music City Fencing, Division Chair, and Regional Coordinator, was working to advance Defendant USA Fencing's interests. In these roles, Piraino worked to promote USA Fencing to the public and attract new members to the sport, which generated revenue for USA Fencing in the form of annual dues. Piraino provided valuable services to USA

14

Fencing by organizing and managing tournaments, meetings, camps, and other events. He was also responsible for implementing and ensuring compliance with various rules, policies, and directives issued by USA Fencing, including policies relating to sexual misconduct and abuse.

58. USA Fencing had the right to terminate Piraino from his roles in USA Fencing if he did not conduct himself in a manner of which USA Fencing approved. If Piraino was found to have violated a policy, manual, code of conduct, training, procedure, rule, or directive issued by USA Fencing, then USA Fencing was authorized to remove him from any of the positions he held or strip him of his membership in the organization. Without his membership in USA Fencing, Piraino would not have been allowed or able to own and operate a USA Fencing member club, act as Tennessee Division Chair, or act as Regional Coordinator.

59. Piraino was USA Fencing's sole actor and sole representative with regard to USA Fencing's membership in Tennessee. Fencers, coaches, referees, and other members who participated in fencing activities in Tennessee viewed Piraino as USA Fencing's representative in the state, and had no significant interaction with any person other than Piraino who could be considered an agent or representative of USA Fencing. At no point during the times relevant to this lawsuit did Jane Doe or her parents have any significant interaction with any person other than Piraino who could be considered an agent or employee of USA Fencing.

**USA Fencing Fails to Effectively Monitor or Supervise Piraino**

60. USA Fencing's promotion and public commendation of Piraino was based on a fantasy. The reality is that while USA Fencing was making Piraino the face of the sport for the southeastern region of the United States, he was molesting underage fencers, getting drunk with underage fencers, carrying on sexually explicit dialogue with underage fencers over text message and SnapChat, speaking openly with other coaches about his desire to engage in criminal sexual activity with

15

underage fencers, and flagrantly failing to enforce and violating SafeSport's and USA Fencing's policies relating to sexual misconduct and abuse. USA Fencing and Music City Fencing failed to take reasonable measures that would have detected and prevented this conduct and, ultimately, would have prevented Piraino from abusing Jane Doe.

61. Piraino engaged in belligerent and unethical behavior at fencing tournaments. He would berate fencers, coaches, and referees. He would use his stature within USA Fencing to overturn referee decisions and refuse to certify results that were unfavorable to him or his club. He also failed to pay referees on time and asked them to do extra work for no pay.

62. Piraino regularly had direct and unsupervised electronic communications with underage fencers at Music City Fencing. These communications were often sexually inappropriate. Piraino would text and SnapChat young female fencers in the evening and on weekends, attempt to engage in sexual banter with them, and ask them to send him sexually suggestive photos. Piraino had a reputation among the girls at Music City Fencing for behaving inappropriately and they would talk to each other about his sexually inappropriate overtures toward them.

63. Piraino would regularly have unsupervised one-on-one interactions with young fencers. He would conduct private lessons with fencers and would find excuses to be alone with them in his office or in the locker rooms.

64. Piraino would joke with other coaches at Music City Fencing about engaging in criminal sexual activity with young fencers. According to one coach, "if Piraino was serious about some of the things he said, he should spend the rest of his life in prison."

16

65. Piraino would attend social events, such as birthday and Christmas parties, with young fencers. At these events, he would drink to the point of visible intoxication and would provide underage fencers with alcohol.

66. In 2015, Piraino was arrested for public intoxication.

67. In June 2016, Piraino molested a teenage boy who was taking lessons at Music City Fencing Club. In 2022, the Davidson County, Tennessee District Attorney's Office prosecuted Piraino in connection with this incident and he pled guilty to sexual battery by an authority figure. *State of Tennessee v. Robert Piraino*, Case No. 2022-B-1214 (Davidson County Criminal Court).

68. Sometime in 2016 or 2017, Piraino grabbed a young female fencer's bottom at a party. The fencer was visibly upset and crying after this incident. Some of the fencers and parents at Music City Fencing were aware of this incident when it happened.

69. Piraino was able to continue this behavior for years because USA Fencing failed to take reasonable measures to prevent a person in his position from engaging in this sort of conduct and to detect such conduct when it occurred.

70. USA Fencing made Piraino the Division Chair and Regional Coordinator, and granted him the Spirit of Sport and Club of Excellence Awards, without inquiring into his actual background and reputation at Music City Fencing Club and within the Tennessee Division. Even a cursory inquiry would have revealed that he was not the type of person who should be supervising minors, was not the type of person who should be granted responsibility for implementing and enforcing USA Fencing's policies and procedures relating to the prevention of sexual abuse, and was not the type of person who should be granted awards recognizing his exceptional character and efforts to promote the sport of fencing to young women and minors. Year after year, USA Fencing recklessly promoted Piraino as an excellent coach who exemplified the core values of the organization, and who had created a "positive

17

culture" for minors and young women, without taking the time to check whether these representations were accurate.

71. Having placed Piraino in a unique position of authority within the sport without making appropriate inquiries into his background, USA Fencing then failed to monitor or supervise his behavior. Some of Piraino's behavior, of course, violated USA Fencing's and, once it was in existence, SafeSport's, policies. But USA Fencing created a system where the only person tasked with ensuring that Piraino and the other coaches at Music City Fencing followed those policies was Piraino. USA Fencing did not have an audit process or other mechanism in place to detect when repeated and pervasive violations of applicable laws and policies relating to sexual misconduct were occurring within one of its divisions or at one of its member clubs.

72. Perhaps most critically, USA Fencing and Music City Fencing failed to provide young fencers and their parents with information and training concerning MAAPP, the SafeSport Code, or USA Fencing's fencing-specific policies and procedures relating to the prevention and detection of sexual abuse. As a result, Piraino was able to cultivate inappropriate relationships with young fencers using techniques, such as unsupervised one-on-one contact and communications, that fencers and parents did not recognize as violating applicable codes of conduct, particularly when those techniques were being used by a person who USA Fencing held out as one of the most lauded and respected people within the entire organization.

73. In the same vein, USA Fencing and Music City Fencing failed to provide young fencers and their parents with information and training concerning the procedures for reporting sexually inappropriate behavior by a coach to USA Fencing or SafeSport. As a result, the numerous young fencers who were molested or harassed by Piraino, and for whom Piraino was the representative and face of USA Fencing,

18

were not aware of the procedure for initiating an independent investigation of his behavior.

74. Finally, pursuant to Fed. R. Civ. P. 11(b)(3), Plaintiffs allege that before or during the time Piraino was sexually abusing Jane Doe, USA Fencing was in possession of information concerning Piraino's sexually inappropriate and abusive behavior as described above.

**USA Fencing Ignores a Complaint of Sexual Misconduct Against Piraino**

75. On February 25, 2017, Piraino touched a woman's breasts without her consent at a fencing tournament in Tennessee that Piraino organized and managed pursuant to his duties as Tennessee Division Chair.

76. The woman, who was on her college fencing team at the time, was a USA Fencing member and was serving at the tournament as a referee.

77. Three days later, she filed a written complaint with USA Fencing on a form provided by USA Fencing for this purpose. She explained the incident in detail and provided the name and contact information of a witness.

78. Shortly thereafter, USA Fencing contacted her and told her that she needed to change her complaint form. On the form, she had indicated that she was submitting the complaint under the category of "sexual misconduct." She was told that she instead needed to submit the complaint under the category of "physical misconduct."

79. The woman made the requested change and re-submitted the form via email directly to USA Fencing's CEO, Kris Ekeren.

80. She was then asked to participate in a phone call with Ms. Ekeren and a third person whose identity is not known to Plaintiffs. The call took place on March 3, 2017. During the call, the woman explained the incident with Piraino in detail and voiced other concerns relating to Piraino's abusive and unethical conduct at fencing tournaments.

19

81.     March 3, 2017, is an important date. As noted above, that was the date that SafeSport went online and USA Fencing lost authority to investigate and resolve allegations of sexual misconduct without SafeSport's involvement. Pursuant to Fed. R. Civ. P. 11(b)(3), Plaintiffs allege that USA Fencing's purpose in asking the woman to change her complaint was to avoid scrutiny from SafeSport. If she had submitted a complaint relating to "sexual misconduct," then USA Fencing would have been required to refer the complaint to SafeSport under the SafeSport Code and under its own internal policies and procedures. A complaint of "physical misconduct," however, could be reviewed internally.

82.     USA Fencing ignored the woman's complaint. It never contacted the witness who was identified on the complaint form, never referred the matter to SafeSport, and never took any formal action against Piraino. Pursuant to Fed. R. Civ. P. 11(b)(3), Plaintiffs allege that USA Fencing took no steps to investigate the complaint (or to investigate Piraino or his club as a result of the complaint) and did not take any informal or internal action against Piraino as a result of the complaint.

83.     It must be noted for context that this complaint was filed with USA Fencing less than 60 days after Larry Nassar was arrested on charges of child pornography and child molestation, when the entire nation was focused on sexual abuse of athletes in Olympic sports.

84.     Further, it was only after this complaint was made and mishandled that USA Fencing proceeded to begin its unceasing marketing campaign for Piraino as described in detail above, granting him every award USA Fencing had to give, including specific awards for having a safe club for minors and women.

**USA Fencing's Mishandling of Complaints Was Systemic**

85.     USA Fencing's treatment of the Piraino complaint described above is representative of its response to such complaints over the time period relevant to this lawsuit. Due to USA Fencing's negligence (at best) in relation to the complaint

20

process, an environment was created where complaints would only be addressed if individuals went directly to law enforcement authorities like Jane Doe and her parents did.

86. Stakeholders at every level of USA Fencing have publicly voiced concerns with USA Fencing's complaint-handling process, including board members, athletes, parents, coaches, referees, staff members, and officials, as well as the U.S. Olympic and Paralympic Committee.

87. One week after Piraino's arrest, the president of USA Fencing's board announced an emergency meeting to address fencing's sexual abuse epidemic. At that meeting, the president proposed that for the safety of athletes, a task force independent of the current board of directors and USA Fencing national's office should be created to discuss the efficiency and efficacy of SafeSport and to evaluate any other proactive measures that USA Fencing could take to protect the fencing community. Several news outlets reported on the level of vitriol that was leveled at USA Fencing's board and officers during the meeting. Multiple members stated that they had reported sexual abuse to USA Fencing and that USA Fencing either took no action, intimidated them or minimized their allegations, or lost track of their complaints.

88. In response to the number of complaints it was receiving about the organization, the U.S. Olympic and Paralympic Committee conducted a forensic audit of USA Fencing. One of the key findings of the audit was that USA Fencing "has not responded to or followed up on complaints, or timely responded to complaints" related to athlete safety matters and disciplinary procedures. The audit also noted that complainants felt the grievance process was "confusing" and that when complainants reported concerns, they were not directed to a formal reporting process.

89. In 2022, USA Fencing conducted its own survey of referees, coaches, and officials. The report summarizing the survey concluded that "[g]ender based violence

21

in fencing is a significant concern among respondents." The following were cited as representative examples of survey responses that USA Fencing received:

- "if USA Fencing were serious about this, referees with histories of sexual harassment wouldn't be hired;"

- "anyone who has violated SafeSport policies should not be eligible for leadership or mentorship roles;"

- "no one expects anything to be done in response to a report, so they don't bother reporting;"

- "no one will read this [survey]."

### Defendant Piraino Sexually Abuses Jane Doe

90. For Jane Doe and her family, the consequences of USA Fencing's actions in promoting and publicly commending Piraino while completely failing to monitor or supervise him were devastating.

91. Jane Doe started taking fencing lessons at Music City Fencing in July 2017, when she was 11 years old.

92. When Jane Doe was 13, Piraino started communicating with her directly via text message and SnapChat,[12] without her parents' knowledge. At first, these communications were not sexual in nature. Piraino and Jane Doe would chat about fencing-related matters. Jane Doe did not consider the communications to be unusual because she knew that Piraino was doing the same thing with other fencers at Music City Fencing and did not understand that such communications were part of the grooming process.

---

12  SnapChat is a social media application. Its defining feature is that messages, pictures, and videos sent through the application are only viewable by the recipient for a short time before they automatically disappear.

93.     Around the spring or summer of 2019,[13] Jane Doe entered a college scholarship competition held by USA Fencing. As part of the competition, she was required to submit an essay.

94.     Jane Doe reached out to Piraino for help with the essay because he was the Chair of the Tennessee Division.

95.     Piraino told Jane Doe that he would help her with the essay, but that he wanted something in return. Jane Doe did not initially understand what he meant. He soon clarified that he wanted Jane Doe, who was 13 at the time, to send him photos of herself. He told her that he would write the scholarship essay for her if she sent him photos in her bikini, which she did.

96.     Over the following months, Piraino began pressuring Jane Doe to send additional photos. He would regularly send her text messages and SnapChat messages, telling her, for example, that she looked "hot" during fencing practice that day and pleading with her to send him more photos.

97.     Because Jane Doe was reluctant to send photos, he began to exert pressure in other ways. He offered to compensate Jane Doe for photos by giving her a prepaid debit card that he would refill when she sent a photo he wanted. He also purchased fencing and other athletic equipment for her and waived fees for lessons, camp, and other fencing-related activities.

98.     Piraino would also exert financial pressure on Jane Doe by telling her that she needed to make money to help her family. In particular, when the COVID-19 pandemic started, Piraino told Jane Doe that it was important for her to comply with his demands because her family was struggling financially due to the pandemic.

---

13  Plaintiffs have to approximate the dates of certain events described in this Complaint because Jane Doe's cell phone, laptop, and other evidence that could provide more exact dates are currently in the possession of the Davidson County, Tennessee District Attorney's Office, which pursued criminal charges against Piraino in connection with his abuse of Jane Doe. *See State of Tennessee v. Robert Piraino*, Case No. 2022-A-135, Davidson County Criminal Court, Division II.

99. In response to this pressure, Jane Doe sent Piraino dozens of photos of herself naked or semi-naked in sexually suggestive positions.

100. Once Piraino established a regular pattern of obtaining photos from Jane Doe, his behavior escalated.

101. Piraino would text and SnapChat Jane Doe nearly every day and at random times. During the approximately two-year period when the abuse occurred, Piraino sent Jane Doe thousands of text messages, photos, and videos, many if not most of which were sexually inappropriate. The following is an illustrative example: Piraino, who is a heavy drinker, was out at a bar. He went to the bathroom, took a photograph of himself, sent it to Jane Doe, and asked her if she wanted him to send her a video of him masturbating.

102. Jane Doe soon learned to expect that her normal life activities as a teenager—going to school, doing homework, spending time with friends, having dinner with her family—would be set against a backdrop of incoming sexually explicit communications, photos, and videos from Piraino.

103. Over time, Piraino's demands of Jane Doe became increasingly sexual, demeaning, threatening, and bizarre.

104. Piraino would demand that Jane Doe send videos of herself touching her breasts and masturbating.

105. Piraino would demand that Jane Doe send him videos of herself engaging in "dirty talk," with him supplying specific phrases for her to repeat.

106. Piraino would send Jane Doe pictures that he had found on the internet of women in sexually suggestive positions and demand that Jane Doe take photos of herself mimicking what she saw in the pictures.

107. Piraino purchased clothing for Jane Doe and would tell her to send him photos in sexually suggestive positions wearing the clothing.

24

108. Piraino would leave a cell phone in the locker room at Music City Fencing and tell Jane Doe that after practice, she was to go in the locker room, take photos of herself using the phone, and leave the phone in the locker room for him to retrieve. Sometimes he would also leave clothing in the locker room for Jane Doe to wear when taking photos.

109. Jane Doe sent Piraino at least dozens of photos and videos in response to his demands as described above. The precise number and content of these communications are not fully known to Plaintiffs at this time because the communications are in the possession of the Davidson County, Tennessee District Attorney's Office.

110. Jane Doe sent Piraino photos and videos over SnapChat, and thus believed that they were being automatically erased. But Piraino would "screen shot" the images and use a second device to record the videos. On occasion, Piraino would send photos and videos that Jane Doe had sent him back to her, as a reminder that he was in possession of them, and as a threat that he would show the photos and videos to others if she told anyone about what he was doing.

111. Piraino made comments to Jane Doe that led her to believe he intended to sell her photos and videos online.

112. Piraino had a fetish for children's feet and socks. He would make Jane Doe give him her socks in exchange for money. He would provide Jane Doe with socks, tell her to wear them, and then return them to him. He would send her videos of himself masturbating into socks. He further told Jane Doe that he intended to sell socks that she had worn online.

113. When Jane Doe complied with Piraino's demands, he would provide her money via the prepaid debit card and through gifts of clothes, fencing equipment, athletic gear, and other things of value.

25

114. When Jane Doe did not comply with Piraino's demands, she was punished. If she refused to send a photo or video that Piraino requested, he would show up to the next fencing practice in a rage. Throughout practice, he would find pretextual reasons to single her out for harsh treatment and berate her in front of other students.

115. He would also physically punish her. Sometime during 2020, Jane Doe began experiencing pain in her shoulder during fencing activities. Piraino knew this and, during fencing practice, would make Jane Doe perform exercises to aggravate her shoulder, knowing that this caused her excruciating pain. He would do this in direct response to Jane Doe refusing one of his demands for photos and videos.

116. After Jane Doe began seeing health care providers for her shoulder, Piraino while aware of the fact, continued to make her perform these painful exercises over and over again.

117. Jane Doe has suffered permanent injuries to her shoulder as a result of this treatment. She and her parents have incurred and will continue to incur substantial medical expenses in treating her injuries.

118. Piraino's communications with Jane Doe also included sexually explicit photos and videos of Piraino. Piraino would send Jane Doe pictures of his penis. He would send her videos of him masturbating. During these videos, he would say that he wished Jane Doe were with him so that they could engage in sexual activity together.

119. Piraino also sent Jane Doe videos of himself having sex with and receiving oral sex from women, including a video of him receiving oral sex from a girl who he told Jane Doe was underage.

120. Piraino's contact with Jane Doe was not limited to photos and videos. He began to touch her inappropriately. At practices and tournaments, he would insist on giving Jane Doe massages, either in an area of the gym that was far enough away

26

from other people so as not to be noticed or in a separate room. During these massages, he would fondle her while moaning and grunting sexually. At fencing practices, he would find excuses, such as correcting her fencing technique, to touch intimate parts of Jane Doe's body, including her inner thigh. He would also regularly hug, kiss, and grope her in ways that were inappropriate.

121. In late 2020 and early 2021, it became clear to Jane Doe that Piraino was grooming her to be raped. He began talking explicitly about how, when she turned 16, they would have sex in his apartment. He also told her that during summer fencing camp in 2021, he would have her perform manual and oral sex on him in the locker room at Music City Fencing. These statements were made with the understanding that Piraino would compensate Jane Doe for sex in the same manner that he had been compensating her for photos and videos. Piraino also told Jane Doe that he would waive her camp fees if she performed sexual acts on him during fencing camp.

122. In December 2020, it was determined that Jane Doe should take time off from fencing to allow her shoulder to heal.

123. Jane Doe used her break from fencing as an opportunity to end Piraino's abuse of her. Sometime in early 2021, she told him via text message to stop contacting her and said that she would no longer comply with his demands.

124. Substantial damage, however, had already been done. During and after the time she was being abused by Piraino, Jane Doe started suffering psychologically and emotionally. She was anxious, depressed, and fearful. Previously a straight-A student, she was struggling in her classes. She began developing obsessive compulsive like tics and was pulling out her own hair, a disorder known as trichotillomania.

125. Confused as to why their previously well-adjusted girl was exhibiting signs of major trauma, Jane Doe's parents sent her to a psychotherapist.

27

126. Jane Doe disclosed Piraino's abuse of her to her psychotherapist on July 27, 2021.

127. Jane Doe's psychotherapist has opined that as a result of Piraino's abuse, Jane Doe "has suffered and continues to suffer from severe clinical anxiety that is interfering with her social, emotional, and sexual adolescent development."

128. Sadly, the foregoing does not reflect the full extent of the damage Piraino has caused Jane Doe.

129. Piraino distributed naked photos of Jane Doe online. Piraino was sharing Jane Doe's photos with a cell of pedophiles who included another former fencing coach (and former member of USA Fencing). Piraino would brag to these individuals about how Jane Doe was his student, that she was 13 years of age at the time the abuse began, and discuss the particularities of her interactions with him including her initial request for help with her scholarship application.

130. Piraino would also discuss sex with children incessantly over non-encoded communication channels, as well as his sexual attraction to minors of both sexes and all ages. Piraino obtained terabytes of pornographic images and videos including pictures of infants and children ages four and five being exposed to horrific sexual exploitation from a known purveyor of child pornography in his circle.

131. One of the individuals with whom Piraino shared Jane Doe's images is a known purveyor of internet child pornography. Pursuant to Fed. R. Civ. P. 11(b)(3), Plaintiffs allege that this person has further distributed her photos and that the photos have now been viewed by others.

132. Further, Piraino made Jane Doe's clothing available for sale to these individuals and others in their network. In one exchange he stated that he would provide socks of a requested color, worn by Jane Doe no less than four hours, ensure the packaging and shipment by a specific date, and provide financial information for

28

direct payment. At the same time, he solicited the buyer for other contacts who might be interested in buying her clothing.

133.     Perhaps most disturbingly, after Piraino was made Region 6 Coordinator by USA Fencing, he began working to open a new fencing club in Orlando. One of the individuals with whom Piraino shared Jane Doe's photos assisted with the setup of the new club by storing needed equipment in New York before transporting it to Florida with Piraino's assistance.  In explaining his excitement to another predator via text, he stated, "now we can tap into the Florida kids."

134.     As a result of Jane Doe reporting him to her psychotherapist, Piraino was arrested on August 9, 2021, by the Metro Nashville Police Department. On November 16, 2022, Piraino pled guilty to multiple counts relating to his sexual abuse of Jane Doe and a male child, including (1) two counts of especially aggravated exploitation of a minor and (2) one count of sexual exploitation of a minor via electronic means. He has been sentenced to 25 years in prison without parole and upon his release will be placed on the sex offender registry for life. *See State of Tennessee v. Robert Piraino*, Case Nos. 2022-A-135, 2022-B-1214, Davidson County Criminal Court, Division II.

135.     In contrast to USA Fencing's public commendation of Piraino and his club as the model for providing a positive and safe environment for minors and women, during the criminal proceedings against him, the head of the Crimes Against Children Unit at the Davidson County District Attorney's Office stated that he was "as dangerous a child predator as this [District Attorney] has ever dealt with."

## CLAIMS FOR RELIEF
### Count 1 – Intentional Infliction of Emotional Distress
### Against Defendants Piraino and Music City Fencing

136.     Plaintiffs repeat and reallege each and every allegation in this Complaint as if fully set forth herein.

29

137. Defendant Piraino acted intentionally when he sexually abused Jane Doe.

138. Defendant Piraino's conduct, which included coercing Jane Doe to produce sexually explicit photos and videos, distributing her naked photos online, physically punishing her when she refused to send him photos and videos, sending her videos of himself having sex, and grooming her for sex, all while he had been placed in a position of trust to supervise her and care for her well-being, was so outrageous and extreme as to go beyond all bounds of decency, and would be regarded by any civilized society as atrocious and utterly intolerable.

139. Jane Doe suffered serious and severe mental and emotional injuries as a result of Piraino's conduct, including anxiety, depression, grief, humiliation, and loss of innocence.

140. Jane Doe suffered physical injuries as a result of Piraino's conduct, including permanent injuries to her shoulder that require extensive rehabilitation and possibly surgical intervention.

141. Jane Doe's parents, John and Judy Doe, suffered economic injuries as a result of Piraino sexually abusing their daughter, including the costs of Jane Doe's medical and psychiatric treatment.

142. Music City Fencing is vicariously liable for Piraino's conduct because Piraino was an agent of Music City Fencing and was acting within the scope of his authority as an agent of Music City Fencing when he sexually abused Jane Doe.

## Count 2 – Assault and Battery
### Against Defendants Piraino and Music City Fencing

143. Plaintiffs repeat and reallege each and every allegation in this Complaint as if fully set forth herein.

144. Piraino acted intentionally when, during his massages of Jane Doe, he moaned and grunted sexually while fondling her.

30

145. Piraino acted intentionally when he forced Jane Doe to perform painful shoulder exercises as punishment for her refusing to provide him with sexually explicit photos and videos.

146. Piraino acted intentionally when he used fencing instruction as a pretext to touch intimate parts of Jane Doe's body, including her inner thigh.

147. Piraino acted intentionally when he hugged, kissed, and groped Jane Doe at fencing practices and fencing tournaments without her consent.

148. Piraino's conduct was unlawful under Tenn. Code §§ 39-13-505 and 39-13-509.

149. Piraino's conduct was offensive and violated Jane Doe's personal dignity. A teenage girl should have a reasonable expectation that a grown man in a position of authority over her will not grope her while making obscene grunting noises and will not physically punish her for refusing to produce sexually explicit photos and videos.

150. Jane Doe did not consent to Piraino's conduct.

151. Jane Doe was unable to consent to Piraino's conduct because she was a minor and Piraino was in a position of authority over her.

152. Jane Doe suffered serious and severe mental and emotional injuries as a result of Piraino's conduct, including anxiety, depression, grief, humiliation, and loss of innocence.

153. Jane Doe suffered physical injuries as a result of Piraino's conduct, including permanent injuries to her shoulder that require extensive rehabilitation and possibly surgical intervention.

154. Jane Doe's parents, John and Judy Doe, suffered injuries as a result of Piraino's conduct, including the costs of Jane Doe's medical and psychiatric treatment.

31

155. Music City Fencing is vicariously liable for Piraino's conduct because Piraino was an agent of Music City Fencing and was acting within the scope of his authority as an agent of Music City Fencing when he sexually abused Jane Doe.

**Count 3 – Negligence, Negligent Supervision, and Negligence Per Se Against Defendant USA Fencing**

156. Plaintiffs repeat and reallege each and every allegation in this Complaint as if fully set forth herein.

157. At all times relevant to this Complaint, the risk of sexual abuse in youth sports was generally well-known and was actually known to USA Fencing. USA Fencing was aware that numerous members of the fencing community had been sexually assaulted or abused in the course of their participation in fencing activities. It was foreseeable that if USA Fencing did not take measures to prevent sexual abuse from occurring within the sport, and to detect sexual abuse when it occurred, a young fencer like Jane Doe could be sexually abused by her coach.

158. In light of the foreseeable risk of sexual abuse, USA Fencing was in a special relationship with young fencers, including Jane Doe, and had a duty of reasonable care to protect them from being sexually abused by their fencing coaches.

159. USA Fencing also had a special relationship with Piraino. It approved Piraino as a member coach, approved Piraino's club as a premium member club, allowed Piraino to serve as Chair of a division that oversaw all fencing operations in Tennessee, and hired Piraino to act as its liaison for a region that included twelve states and thousands of members. It authorized and allowed Piraino to serve as an agent of USA Fencing with regard to young fencers, including Jane Doe. It also publicly commended Piraino for being a safe and excellent coach and an ambassador of the sport to young fencers, and young girls in particular. Further, it had the ability to control Piraino's conduct as demonstrated by the extensive policies and procedures that governed the various positions he held within the organization and his complete

32

dependence on USA Fencing for his ability to act as an Olympic fencing coach and thus to make a living. It voluntarily assumed this relationship with Piraino knowing that it was placing him in a position of supervision and authority over young fencers. By contrast, Jane Doe was an 11-year-old girl when she first met Piraino and could not reasonably have been expected to protect herself from him or exercise control over his actions. USA Fencing therefore had a duty of reasonable care to control Piraino's conduct in a way that would prevent him from sexually abusing young fencers like Jane Doe.

160. Because Piraino was USA Fencing's agent, USA Fencing had a duty to supervise him.

161. When USA Fencing undertook to grant Piraino a series of national awards recognizing his high character and contributions to the sport of fencing, it assumed a duty of reasonable care to ensure that the representations it was making about Piraino were accurate.

162. Specifically, USA Fencing had duties to: (a) Conduct a reasonable inquiry when presented with information that a coach has engaged in sexually inappropriate behavior; (b) Conduct reasonable inquiries into their coaches' backgrounds, particularly those coaches, such as Piraino, who were in position to exert substantial authority, supervision, and control over large portions of the membership; (c) Adopt, implement, and enforce effective policies and procedures to prevent coaches from having direct, unsupervised one-on-one contact or communications with young fencers; (d) Implement effective reporting mechanisms that would allow and encourage members who witnessed, or were victims of, sexually inappropriate behavior to notify USA Fencing, SafeSport, or legal authorities; (e) Provide information and training to young fencers and their parents concerning applicable policies relating to sexual misconduct and abuse; and (f) Provide information and training to young fencers and their parents concerning the SafeSport

33

Code and the procedures for reporting sexually inappropriate conduct by coaches and other members.

163. Beginning March 3, 2017, the SafeSport Code and USA Fencing's internal policies and procedures imposed a duty on USA Fencing to refer complaints of sexual misconduct to SafeSport.

164. Beginning January 2019, SafeSport's MAAPP and federal law imposed a duty on USA Fencing to "implement reasonable procedures to limit one-on-one interactions between an amateur athlete who is a minor and an adult (who is not the minor's legal guardian) at a facility under the jurisdiction of a national governing body or paralympic sports organization without being in an observable and interruptible distance from another adult, except under emergency circumstances."[14] 36 U.S.C. §§ 220524, 220541(b). Jane Doe is within the category of persons meant to be protected by this law, and a violation of this law that causes harm to Jane Doe is therefore negligence per se.

165. Beginning January 2019, SafeSport's MAAPP and federal law imposed a duty on USA Fencing to "offer and give consistent training related to the prevention of child abuse to: (1) adult members who are in regular contact with amateur athletes who are minors and (2) subject to parental consent, to members who are minors."[15] 36 U.S.C. §§ 220524, 220541(b). Jane Doe is within the category of persons meant to be protected by this law, and a violation of this law that causes harm to Jane Doe is therefore negligence per se.

166. USA Fencing's duties extended to John Doe and Judy Doe because it was foreseeable that they would be injured if USA Fencing failed to use reasonable care in preventing its coaches from sexually abusing their daughter.

14  U.S. Center for SafeSport, "Minor Athlete Abuse Prevention Policies," p. 3 (January 23, 2019).
15  *Id.*

167. USA Fencing, by and through its directors, officers, employees, contractors, representatives, and agents, breached its duties to Jane Doe and her parents by ignoring the young woman's complaint that Piraino touched her breasts without consent at a fencing tournament and by taking steps to avoid SafeSport scrutiny of the complaint.

168. USA Fencing, by and through its directors, officers, employees, contractors, representatives, and agents, breached its duties to Jane Doe and her parents by failing to conduct reasonable inquiries into Piraino's background and reputation both before he became a member coach and as it was elevating him within the organization and promoting him to the public.

169. USA Fencing, by and through its directors, officers, employees, contractors, representatives, and agents, breached its duties to Jane Doe and her parents by failing to supervise or monitor Piraino's compliance with USA Fencing's policies and procedures relating to the prevention and detection of sexual abuse.

170. USA Fencing, by and through its directors, officers, employees, contractors, representatives, and agents, including Piraino, breached its duties to Jane Doe and her parents by failing to implement and enforce policies and procedures that would prevent coaches from having direct, unsupervised one-on-one contact or communications with young fencers. This failure also violated federal law.

171. USA Fencing, by and through its directors, officers, employees, contractors, representatives, and agents, including Piraino, breached its duties to Jane Doe and her parents by failing to provide them, as well as other young fencers and their parents, with information or training on applicable policies and procedures relating to the prevention and detection of sexual abuse, including MAAPP, the SafeSport Code, and USA Fencing's fencing-specific safe-sport policies. This failure also violated federal law.

35

172. USA Fencing, by and through its directors, officers, employees, contractors, representatives, and agents, including Piraino, breached its duties to Jane Doe and her parents by failing to provide them, as well as other young fencers and their parents, with information or training concerning the procedures for reporting Piraino's inappropriate behavior to USA Fencing or SafeSport. This failure also violated federal law.

173. Pursuant to Fed. R. Civ. P. 11(b)(3), Plaintiffs allege that USA Fencing breached its duties to Jane Doe and her parents by failing to conduct a reasonable inquiry into Piraino even though, during the time he was a head coach at Music City Fencing, it came into possession of information that he was engaging in sexually inappropriate and abusive behavior with young fencers.

174. USA Fencing knew that Piraino was unfit to act as owner and head coach of Music City Fencing, Tennessee Division Chair, and Region 6 Coordinator because it had received a complaint that he engaged in sexually inappropriate behavior during a fencing tournament.

175. USA Fencing knew that Piraino was unfit to act as owner and head coach of Music City Fencing, Tennessee Division Chair, and Region 6 Coordinator because, under these circumstances, Piraino's knowledge as an agent of USA Fencing is legally imputed to the organization.

176. Assuming that USA Fencing did not know that Piraino was unfit to serve in the roles he held within the organization, it should have known and would have known if it had not breached its duties to Jane Doe and her parents as described above.

177. USA Fencing's breach of its duties caused Jane Doe's injuries because if USA Fencing had acted with reasonable care, Piraino either would not have been in a position to abuse Jane Doe, or his abuse of Jane Doe would have been detected and stopped.

36

178. As a direct and proximate result of USA Fencing's breach of its duties to her, Jane Doe has suffered injuries, including physical injuries, severe mental and emotional injuries such as anxiety, depression, stress, grief, humiliation, and loss of innocence, and economic injuries such as lost earning potential and the costs of medical and psychiatric treatment.

179. As a direct and proximate result of USA Fencing's breach of its duties to them, John Doe and Judy Doe have suffered economic injuries, including the costs of Jane Doe's psychiatric and medical treatment.

## Count 4 – Negligence, Negligent Supervision, and Negligence Per Se Against Defendant Music City Fencing

180. Plaintiffs reallege and repeat each and every allegation of this Complaint as if fully set forth herein.

181. The risk of a fencer being sexually abused by a coach was foreseeable to Defendant Music City Fencing as an organization offering youth athletics programs.

182. In light of the foreseeable risk that a young fencer would be sexually abused by a coach, Music City Fencing had a duty of reasonable care not to hire and retain coaches who would sexually abuse young fencers and to properly supervise coaches so that they would not be in a position to sexually abuse young fencers.

183. Music City Fencing was in a special relationship with Piraino and in a special relationship with young fencers like Jane Doe, and therefore had a duty to take reasonable measures to control Piraino's behavior and prevent him from sexually abusing his students.

184. Because Piraino was USA Fencing's agent, USA Fencing had a duty to supervise him.

185. Beginning February 24, 2018, federal law imposed a duty on Music City Fencing to "establish reasonable procedures to limit one-on-one interactions, including communications, between an amateur athlete who is a minor and an adult

37

(who is not the minor's legal guardian) at a facility under the jurisdiction of the applicable amateur sports organization without being in an observable and interruptible distance from another adult, except under emergency circumstances … ." 36 U.S.C. § 220530(a)(2). Jane Doe is within the category of persons meant to be protected by this law, and a violation of this law that causes harm to Jane Doe is therefore negligence per se.

186. Beginning February 24, 2018, federal law imposed a duty on Music City Fencing to "offer and provide consistent training to all adult members who are in regular contact with amateur athletes who are minors, and subject to parental consent, to members who are minors, regarding prevention and reporting of child abuse to allow a complainant to easily report an incident of child abuse to appropriate persons." 36 U.S.C. § 220530(a)(3). Jane Doe is within the category of persons meant to be protected by this law, and a violation of this law that harms Jane Doe is therefore negligence per se.

187. Music City Fencing's duty extended to John and Judy Doe because it was foreseeable that they would be injured if it failed to take reasonable measures to prevent its coaches from sexually abusing their daughter.

188. Music City Fencing breached its duties by hiring and retaining Piraino as head coach even though, by and through its officers, directors, employees, contractors, representatives, and agents, including Piraino, it had knowledge that Piraino was unfit to coach young fencers.

189. Music City Fencing, by and through its officers, directors, employees, contractors, representatives, and agents, including Piraino, breached its duties by hiring and retaining Piraino as head coach without conducting a reasonable inquiry into his background and reputation.

190. Music City Fencing, by and through its officers, directors, employees, contractors, representatives, and agents, including Piraino, breached its duties by

38

failing to establish and enforce reasonable procedures to limit one-on-one interactions, including communications, between coaches and their fencing students. This failure also violated federal law.

191. Music City Fencing, by and through its officers, directors, employees, contractors, representatives, and agents, including Piraino, breached its duties by failing to offer and provide consistent training to coaches and fencers regarding prevention and reporting of child abuse to allow a complainant to easily report an incident of child abuse to appropriate persons. This failure also violated federal law.

192. Music City Fencing's breach of its duties caused Jane Doe's injuries because if Music City Fencing had acted with reasonable care, Piraino either would not have been in a position to abuse Jane Doe, or his abuse of Jane Doe would have been detected and stopped.

193. As a direct and proximate result of Music City Fencing's breach of its duties to her, Jane Doe has suffered injuries, including physical injuries, severe mental and emotional injuries such as anxiety, depression, stress, grief, humiliation, and loss of innocence, and economic injuries such as lost earnings potential and the costs of medical and psychiatric treatment.

194. As a direct and proximate result of Music City Fencing's breach of its duties to them, John Doe and Judy Doe have suffered economic injuries, including the costs of Jane Doe's psychiatric and medical treatment.

### Count 5 – Violation of Federal Sex Trafficking Laws
### Against Defendants Piraino, Music City Fencing, and USA Fencing

195. Plaintiffs reallege and repeat each and every allegation of this Complaint as if fully set forth herein.

196. Under 18 U.S.C. § 1591(a), a person violates the Trafficking Victims Protection Act if the person:

knowingly—

39

(1) in or affecting interstate or foreign commerce …
recruits, entices, harbors, transports, provides, obtains,
advertises, maintains, patronizes, or solicits by any
means a person; or
(2) benefits, financially or by receiving anything of value,
from participation in a venture which has engaged in an
act described in violation of paragraph (1),

Knowing … that means of force, threats of force, fraud,
coercion … or any combination of such means will be used
to cause the person to engage in a commercial sex act, or
that the person has not attained the age of 18 years and
will be caused to engage in a commercial sex act … .

197. Under 18 U.S.C. § 1594(a), "[w]hoever attempts to violate [18 U.S.C. § 1591] shall be punishable in the same manner as a completed violation of that section … ."

198. Piraino violated 18 U.S.C. §§ 1591(a) and 1594(a) by: (a) Recruiting, enticing, and soliciting Jane Doe to participate in an arrangement under which Piraino would provide Jane Doe scholarships, gift cards, clothes, money, and other things of value for photos and videos of her engaging in sex acts; (b) Recruiting, enticing, and soliciting Jane Doe to participate in an arrangement under which Piraino would sell her photos and videos to child predators online; (c) Forcing Jane Doe to perform physical exercises that aggravated her shoulder injury when she did not agree to perform sex acts in exchange for gift cards, clothes, money, and other things of value; and (d) Telling Jane Doe that when she turned 16, she could come to his apartment and have sex with him, that they could have sex at fencing tournaments, and that they could have sex at fencing camp, with the understanding and explicit representation that he would compensate her for sex.

199. Piraino's actions were in or affecting interstate commerce because: (a) He used the instrumentalities of interstate commerce, including cell phones, computers, the internet, and social media, to facilitate his commercial sex trafficking

40

venture; (b) He compensated Jane Doe for commercial sex acts with prepaid gift cards, which rely on credit card processing services provided by international institutions; and (c) He used his position as the regional coordinator of a national athletic association to coerce and intimidate Jane Doe into performing commercial sex acts.

200. Under 18 U.S.C. § 1595(a), an individual who is a victim of sex trafficking:

> may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

201. Under 18 U.S.C. § 2255(a):

> Any person who, while a minor, was a victim of a violation of [18 U.S.C. § 1591] and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred. The court may also award punitive damages and such other preliminary and equitable relief as the court determines to be appropriate.

202. USA Fencing participated in a venture with Piraino when it allowed him to act as an agent for the organization, hired him as Region 6 Coordinator, allowed him to serve as chair of an administrative division within the organization, and approved him and his fencing club as members of the organization.

203. Music City Fencing participated in a venture with Piraino. Piraino was the sole owner, officer, and director of Music City Fencing and exercised control over the management of the company.

41

204. USA Fencing knowingly benefitted from its venture with Piraino. The services that Piraino provided to USA Fencing as Region 6 Coordinator and Chair of the Tennessee Division were of value to USA Fencing. The dues that USA Fencing received from the coaches and fencers at Music City Fencing as a result of Piraino's actions on its behalf were also of value to USA Fencing.

205. Music City Fencing knowingly benefitted from its venture with Piraino. The services that Piraino provided to Music City Fencing as its officer and agent were of value to Music City Fencing. The dues and other fees that Music City Fencing received from the coaches and fencers at Music City Fencing were of value to Music City Fencing.

206. USA Fencing knew that Piraino was engaged in conduct that violated 18 U.S.C. §§ 1591(a) and 1594(a) because, under these circumstances, Piraino's knowledge of his own behavior is legally imputed to USA Fencing as an agent of the organization.

207. Leaving aside Piraino's knowledge of his own behavior, USA Fencing should have known that Piraino was engaged in conduct that violated 18 U.S.C. §§ 1591(a) and 1594(a). It knew that numerous sexual assaults and other incidents of sexual abuse had occurred within the sport and that youth athletics can be a high-risk environment for sexual abuse. But it failed to adopt and implement reasonable measures to detect such abuse when it occurred. Specifically as to Jane Doe, USA Fencing: (a) failed to provide her with information or training with regard to the SafeSport Code or any other procedures for reporting Piraino's behavior to USA Fencing or SafeSport and (b) failed to monitor Music City Fencing and Piraino's compliance with USA Fencing and SafeSport's policies and procedures relating to the prevention and detection of sexual abuse, including the SafeSport Code, MAAPP, and USA Fencing's fencing-specific safe-sport policies. If USA Fencing had not failed in this regard, it would have detected Piraino's abuse of Jane Doe.

42

208. Music City Fencing knew that Piraino was engaged in conduct that violated 18 U.S.C. §§ 1591(a) and 1594(a) because, under these circumstances, Piraino's knowledge of his own behavior is legally imputed to Music City Fencing as an agent of the company.

209. Leaving aside Piraino's knowledge of his own behavior, Music City Fencing should have known that Piraino was engaged in conduct that violated 18 U.S.C. §§ 1591(a) and 1594(a). Like USA Fencing, it knew that it was operating in a high-risk environment for sexual misconduct and abuse but completely failed to take reasonable measures that would have detected Piraino's abuse of Jane Doe.

210. Music City Fencing is vicariously liable for Piraino's violations of 18 U.S.C. §§ 1591(a) and 1594(a) because Piraino was an agent of Music City Fencing and was acting within the scope of his authority as an agent of Music City Fencing when he sexually abused Jane Doe.

211. As a result of Piraino's violation of 18 U.S.C. §§ 1591(a) and 1594(a), Jane Doe has suffered injuries, including physical injuries, severe mental injuries such as anxiety, depression, stress, grief, humiliation, and loss of innocence, and economic injuries such as lost earning potential and the costs of medical and psychiatric treatment.

**Count 6 – Violation of Federal Forced Labor Laws
Against Defendants Piraino, Music City Fencing, and USA Fencing**

212. Plaintiffs reallege and repeat each and every allegation of this Complaint as if fully set forth herein.

213. Under 18 U.S.C. § 1589(a), a person violates the Trafficking Victims Protection Act if the person:

> knowingly provides or obtains the labor or services of a
> person by any one of, or by any combination of, the
> following means--

43

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
(2) by means of serious harm or threats of serious harm to that person or another person;
(3) by means of the abuse or threatened abuse of law or legal process; or
(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint … .

214. Piraino violated 18 U.S.C. § 1589(a) by forcing Jane Doe to perform physical exercises that aggravated her injured shoulder when she did not agree to provide sexually explicit photos and videos in exchange for gift cards, clothes, money, and other things of value.

215. Under 18 U.S.C. § 1595(a), an individual who is a victim of a violation of 18 U.S.C. § 1589:

> may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

216. Under 18 U.S.C. § 2255(a):

> Any person who, while a minor, was a victim of a violation of [18 U.S.C. § 1589] and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred. The court may also award punitive damages and such other preliminary and equitable relief as the court determines to be appropriate.

44

217. USA Fencing participated in a venture with Piraino when it allowed him to act as an agent for the organization, hired him as Region 6 Coordinator, allowed him to serve as chair of an administrative division within the organization, and approved him and his fencing club as members of the organization.

218. Music City Fencing participated in a venture with Piraino. Piraino was the sole owner, officer, and director of Music City Fencing and exercised control over the management of the company.

219. USA Fencing knowingly benefitted from its venture with Piraino. The services that Piraino provided to USA Fencing as Region 6 Coordinator and Chair of the Tennessee Division were of value to USA Fencing. The dues that USA Fencing received from the coaches and fencers at Music City Fencing as a result of Piraino's actions on its behalf were also of value to USA Fencing.

220. Music City Fencing knowingly benefitted from its venture with Piraino. The services that Piraino provided to Music City Fencing as its officer and agent were of value to Music City Fencing. The dues and other fees that Music City Fencing received from the coaches and fencers at Music City Fencing were of value to Music City Fencing.

221. USA Fencing knew that Piraino was engaged in conduct that violated 18 U.S.C. § 1589(a) because, under these circumstances, Piraino's knowledge of his own behavior is legally imputed to USA Fencing as an agent of the organization.

222. Leaving aside Piraino's knowledge of his own behavior, USA Fencing should have known that Piraino was engaged in conduct that violated 18 U.S.C. § 1589(a). It knew that numerous sexual assaults and other incidents of sexual abuse had occurred within the sport and that youth athletics can be a high-risk environment for sexual abuse. But it failed to adopt and implement reasonable measures to detect such abuse when it occurred. Specifically as to Jane Doe, USA Fencing: (a) failed to provide her with information or training with regard to the SafeSport Code or any

45

other procedures for reporting Piraino's behavior to USA Fencing or SafeSport and (b) failed to monitor Music City Fencing and Piraino's compliance with USA Fencing and SafeSport's policies and procedures relating to the prevention and detection of sexual abuse, including the SafeSport Code, MAAPP, and USA Fencing's fencing-specific safe-sport policies. If USA Fencing had not failed in this regard, it would have detected Piraino's abuse of Jane Doe.

223. Music City Fencing knew that Piraino was engaged in conduct that violated 18 U.S.C. § 1589(a). Under these circumstances, Piraino's knowledge of his own behavior as an agent of Music City Fencing is legally imputed to the company.

224. Leaving aside Piraino's knowledge of his own behavior, Music City Fencing should have known that Piraino was engaged in conduct that violated 18 U.S.C. § 1589(a). Like USA Fencing, it knew that it was operating in a high-risk environment for sexual misconduct and abuse but completely failed to take reasonable measures that would have detected Piraino's abuse of Jane Doe.

225. Music City Fencing is vicariously liable for Piraino's violation of 18 U.S.C. § 1589(a) because Piraino was an agent of Music City Fencing and was acting within the scope of his authority as an agent of Music City Fencing when he sexually abused Jane Doe.

226. As a result of Piraino's violation of 18 U.S.C. § 1589(a), Jane Doe has suffered injuries, including physical injuries, severe mental injuries such as anxiety, depression, stress, grief, humiliation, and loss of innocence, and economic injuries such as lost earning potential and the costs of medical and psychiatric treatment.

### Count 7 – Violation of Federal Child Pornography Laws
### Against Defendants Piraino and Music City Fencing

227. Plaintiffs reallege and repeat each and every allegation of this Complaint as if fully set forth herein.

228. Under 18 U.S.C. § 2251(a):

46

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in … any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished … if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

229. Piraino violated 18 U.S.C. § 2251(a) by, as set forth in further detail above, persuading, inducing, enticing, and coercing Jane Doe to produce photos and videos of herself engaged in sexually explicit conduct knowing that he was saving the photos and videos on his phones and laptops and was going to distribute the photos and videos online.

230. Under 18 U.S.C. § 2251(e), it is a violation of federal law to attempt to engage in any conduct prohibited by 18 U.S.C. § 2251(a).

231. Piraino violated 18 U.S.C. § 2251(e) by, as explained in further detail above, attempting to persuade, induce, entice, and coerce Jane Doe to produce photos and videos of herself engaged in sexually explicit conduct so that he could save the photos and videos to his phones and laptops and distribute them online to other child predators.

232. Under 18 U.S.C. § 2255(a)

> [a]ny person who, while a minor, was a victim of a violation of [18 U.S.C. § 2251] and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue in any appropriate United States District Court and

47

shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred. The court may also award punitive damages and such other preliminary and equitable relief as the court determines to be appropriate.

233. As a result of Piraino's violation of 18 U.S.C. § 2255, Jane Doe has suffered injuries, including physical injuries, severe mental injuries such as anxiety, depression, stress, grief, humiliation, and loss of innocence, and economic injuries such as lost earning potential and the costs of medical and psychiatric treatment.

234. Music City Fencing is vicariously liable for Piraino's violation of 18 U.S.C. § 2251 because Piraino was an agent of Music City Fencing and was acting within the scope of his authority as an agent of Music City Fencing when he sexually abused Jane Doe.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request the following relief:

(a) Compensatory damages in an amount to be determined;

(b) Punitive damages;

(c) Attorney's fees;

(d) Costs;

(e) Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

(f) Such other and further relief as the Court deems proper and just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Respectfully submitted this 24th day of February, 2023.

THE BLACKBURN FIRM, P.L.L.C.

By: /s/ W. Gary Blackburn
W. Gary Blackburn
Tennessee Bar No. 003484
213 5th Avenue North
Suite 300
Nashville, TN  37219
615-254-7770
gblackburn@wgaryblackburn.com

Attorney for Plaintiffs


SMITH & ASSOCIATES, P.C.

By: /s/ George H. Smith
George H. Smith
Georgia Bar No. 535450
P.O. Box 1343
Decatur, GA  30031
844-943-8529
ghgs@attorneysmith.com

Attorney for Plaintiffs
*Admitted Pro Hac Vice*

49

# CERTIFICATE OF SERVICE

Pursuant to Local Rule 5.01, I certify that the foregoing First Amended Complaint was this date served on the following by electronic filing with the Court's CM/ECF system:

William R. Johnson, Esq.
Partner
Tyson & Mendes, LLP
1616 Westgate Circle #330
Brentwood, TN 37027
*Attorney for Defendant USA Fencing*

Dean T. Howell, Esq.
C. Gavin Shepherd, Esq.
Woolf McClane Bright Allen & Carpenter, PLLC
900 S. Gay Street, Suite 900
Knoxville, TN 3902
*Attorneys for Defendants*
*Music City Fencing Club and Robert Piraino*

This 24th day of February, 2023.

<u>/s/ W. Gary Blackburn</u>
W. Gary Blackburn
Tennessee Bar No. 003484
213 5th Avenue North
Suite 300
Nashville, TN  37219
615-254-7770
gblackburn@wgaryblackburn.com

Attorney for Plaintiffs