# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JANE DOE, a minor, by her parents and next friends JOHN DOE and JUDY DOE, JOHN DOE, in his individual capacity and JUDY DOE, in her individual capacity,** | ) ) ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00560** |
| | ) | **Judge Aleta A. Trauger** |
| **ROBERT PIRAINO, MUSIC CITY FENCING CLUB, INC., and UNITED STATES FENCING ASSOCIATION,** | ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

The plaintiffs, Jane Doe and her parents, John Doe and Judy Doe ("parents"), bring suit

against defendants Robert Piraino, Music City Fencing Club, Inc. ("MCFC"), and USA Fencing

(incorrectly identified in the Amended Complaint as United States Fencing Association), asserting

claims arising from Piraino's sexual abuse of Jane Doe while she was a minor and he was her

fencing coach. The plaintiffs assert the following claims: (1) intentional infliction of emotional

distress against Piraino and MCFC; (2) assault and battery against Piraino and MCFC; (3)

negligence, negligent supervision, and negligence *per se* against all defendants; (4) a claim against

Piraino under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a), for

violation of the Trafficking Victims Protection Act, 18 U.S.C. §§ 1591(a) and 1594(a); (5) a claim

against Piraino under 18 U.S.C. § 1595(a) based on his violation of 18 U.S.C. § 1589(a); (6) claims

against MCFC and USA Fencing under 18 U.S.C. § 1595(a) based on several different theories of

liability; (7) a claim against Piraino under 18 U.S.C. § 2255(a), which creates a civil cause of action for any person who suffered a violation of 18 U.S.C. § 2251, a federal statute criminalizing the sexual exploitation of children; and (8) a claim against MCFC on the grounds that it is vicariously liable for Piraino's violation of 18 U.S.C. § 2251.

Now before the court are: (1) Piraino and MCFC's Motion to Dismiss and Motion to Strike Portions of the Amended Complaint (Doc. No. 41); (2) USA Fencing's Motion to Strike Portions of the First Amended Complaint (Doc. No. 43-1); and (3) USA Fencing's Motion to Dismiss the First Amended Complaint (Doc. No. 44-1). Piraino and MCFC also join in and adopt USA Fencing's motions. The plaintiffs have filed a Response in opposition to each of these motions (Doc. Nos. 52–55), and the defendants have filed Reply briefs in further support of each of the motions (Doc. Nos. 56–59).

For the reasons set forth herein, both Motions to Dismiss will be granted in part and denied in part. USA Fencing's Motion to Strike will be denied in its entirety. Piraino and MCFC's Motion to Strike will be granted in one respect but otherwise denied.

## I.  PROCEDURAL HISTORY AND FACTUAL SUMMARY

Very generally, the plaintiffs allege that Jane Doe suffered sexual abuse from Piraino, her fencing coach, while she was a member of the MCFC. Piraino is the owner, principal, and former head coach of MCFC. MCFC is a Tennessee corporation whose principal place of business is in Nashville. At all times relevant to the FAC, it was "Tennessee's #1 Olympic fencing club." (Doc. No. 36 ¶ 6.)

USA Fencing, a not-for-profit corporation based in Colorado Springs, Colorado, is the national governing body for the Olympic sport of fencing in the United States. As alleged in the FAC, USA Fencing is responsible for, among other things,

promoting the sport of fencing in the United States, determining the standards by which athletes will be chosen to represent the U.S. in international competition, maintaining a national membership system for students, coaches, referees, and other members of the fencing community, and creating a common set of rules and policies that govern members and clubs when participating in fencing-related activities.

(*Id.* ¶ 15.) Further, "[f]encers, coaches, and referees must be members of USA Fencing in order to compete or otherwise participate in USA Fencing-sanctioned tournaments, camps, and other events." (*Id.* ¶ 16.) USA Fencing has more than 30,000 members and 700 approved fencing clubs in the United States. Its operations are organized into six "regions." (*Id.* ¶ 19.) Tennessee, along with most of the other states in the southeastern quadrant of the country, is a member of Region 6. During the time relevant to this lawsuit, USA Fencing's Tennessee Division included 14 clubs with more than 300 members, and it held 10 to 15 tournaments annually in Tennessee. (*Id.* ¶¶ 17, 20.) In the summer of 2014, Piraino began acting as Chair of the Tennessee Division of USA Fencing and, at some point before he started abusing Jane Doe, was "hired" by USA Fencing as Regional Coordinator for Region 6. (*Id.* ¶¶ 45, 47.)

Jane Doe began taking fencing lessons at MCFC in July 2017, when she was eleven years old. (*Id.* ¶ 91.) During the spring or summer of 2019, when she was thirteen, she sought Piraino's assistance in drafting an essay for a USA Fencing-sponsored college scholarship competition. (*Id.* ¶¶ 93–94.) Piraino agreed to help her—but only if she sent him photos of herself in a bikini, which she did. (*Id.* ¶ 95.) The sexual abuse, conducted primarily electronically, began at this time. Over the following months, Piraino sent messages to Jane Doe via text and SnapChat,[1] requesting more photos. (*Id.* ¶ 96.)

---

[1] SnapChat, as explained by the plaintiffs, is a social media application, the defining feature of which is that messages, pictures, and videos sent through the application are only viewable by the recipient for a short time before they automatically disappear. (Doc. No. 36, at 22 n.12.)

Though initially reluctant, Jane Doe agreed to provide nude or semi-nude photographs of herself in sexually suggestive positions when Piraino offered to compensate her with a prepaid debit card. (*Id.* ¶¶ 97–99.) Piraino's inappropriate interactions with Jane Doe continued for well over a year, during which they exchanged thousands of sexually explicit text messages, photographs and videos. (*Id.* ¶¶ 101, 104–08, 118–19.) Piraino preserved the photos and videos and distributed them to others. (*Id.* ¶¶ 110, 129–32, 229, 231.)[2]

When Jane Doe complied with Piraino's demands, he provided her with money and fencing equipment, and he waived fees for lessons and fencing-related activities. (*Id.* ¶¶ 97–99, 113.) During practices at MCFC, Piraino would touch Jane Doe's inner thigh, while correcting her technique; he would also hug, kiss, and grope her. (*Id.* ¶ 120.) He gave her massages, during which he would fondle her while moaning and grunting sexually. (*Id.*) If Jane Doe did not comply with Piraino's demands, he berated her in front of other students and singled her out for harsh treatment and physical punishment, including by making her repeatedly perform exercises that he knew aggravated a shoulder injury that initially manifested itself sometime in 2020, causing her "excruciating pain." (*Id.* ¶¶ 114–16.)

In December 2020, Jane Doe took a break from fencing to rest her injured shoulder. (*Id.* ¶ 122.) In early 2021, she told Piraino that she would no longer communicate with him. (*Id.* ¶ 123.) On July 27, 2021, she reported the sexual misconduct to her psychotherapist. This disclosure led to Piraino's arrest in August 2021. Piraino was charged with 108 counts, based on criminal conduct

---

[2] This allegation regarding the distribution of the images to others supports Count 7 of the FAC, which sets forth the plaintiffs' claim against Piraino (and MCFC) under 18 U.S.C. § 2255, which creates a civil cause of action for any victim of an offense in violation of 18 U.S.C. § 2251. Section 2251 prohibits, among other things, the sexual exploitation of minors and the distribution and possession of child pornography. This claim is not the subject of Piraino and MCFC's Motion to Dismiss.

involving Jane Doe and another minor. (Id. ¶¶ 126, 134.)

The plaintiffs initiated this action on July 27, 2022. Shortly after the filing of the original Complaint (Doc. No. 1), they sought leave both to proceed pseudonymously and to stay the case pending the resolution of criminal charges against Piraino in the Criminal Court for Davidson County (Doc. Nos. 10, 13). The court granted both motions, and this case was stayed through December 2022. (Doc. Nos. 16, 17, 23.) At that time, the plaintiffs provided notice that Piraino had pleaded guilty to "multiple counts relating to his sexual abuse of Jane Doe, including (1) two counts of especially aggravated exploitation of a minor and (2) one count of sexual exploitation of a minor via electronic means" and had been sentenced to 25 years in prison. (Doc. No. 21, at 1–2.)

After reinstatement of the case on the court's active docket, the plaintiffs filed a motion for default judgment against Piraino and MCFC, and USA Fencing filed a motion to dismiss the claims in the original Complaint asserted against it. In response, the plaintiffs filed their First Amended Complaint ("FAC") (Doc. No. 36), which, as relevant here, adds new factual allegations in an attempt to remedy deficiencies identified in USA Fencing's motion. The court denied as moot the motions addressed to the original Complaint, and the defendants then filed the motions now before the court.

## II.     MOTIONS TO DISMISS

### A.     Legal Standard

Both Motions to Dismiss rely upon Federal Rule of Civil Procedure 12(b)(6). In ruling on a motion to dismiss under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). When presented with a Rule 12(b)(6) motion, the court "may

consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint contain "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). However, "[t]he factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, *i.e.*, more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A plaintiff must plead more than "labels and conclusions," "a formulaic recitation of the elements of a cause," or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B. Discussion

As set forth above, the FAC asserts claims against both USA Fencing and MCFC (collectively, the "entity defendants" or the "entities") for negligence, negligent supervision, and negligence *per se* , as well as claims under 18 U.S.C. § 1595(a). USA Fencing seeks dismissal of all of the claims asserted against it. MCFC also seeks dismissal of the same claims, and it further asserts that the intentional infliction of emotional distress ("IIED") claim brought by the parents

is time-barred.

### 1.     The Parents' Negligence Claim

As set forth above, besides the claims on behalf of Jane Doe, the FAC asserts negligence claims against USA Fencing and MCFC on behalf of her parents. Specifically, the parents assert that USA Fencing's and MCFC's "duties extended to John Doe and Judy Doe because it was foreseeable that they would be injured if USA Fencing [and MCFC] failed to use reasonable care in preventing its coaches from sexually abusing their daughter." (Doc. No. 36 ¶¶ 166, 187.) The entities' alleged negligence caused the plaintiffs to "suffer economic injuries, including the costs of Jane Doe's psychiatric and medical treatment." (*Id.* ¶¶ 179, 194.)

The entity defendants acknowledge that the parents are statutorily entitled, under Tennessee law, to seek the recovery of healthcare expenses incurred on behalf of Jane Doe in connection with her claimed injuries. (Doc. No. 44, at 8.) *See* Tenn. Code Ann. § 20-1-105(a) ("The father and mother of a minor child have equal rights to maintain an action for the expenses . . . resulting from an injury to a minor child . . . living in the family[.]"); *see also Rogers v. Donelson-Hermitage Chamber of Commerce*, 807 S.W.2d 242, 247 (Tenn. Ct. App. 1990) ("When a tort is committed against a child, the parents have a derivative cause of action for the . . . medical expenses resulting from the injury." (citation omitted)). The entity defendants assert, however, that the parents are not entitled to recovery of other unspecified "economic injuries" and that, insofar as the parents seek to recover medical expenditures associated with the treatment of Jane Doe's *physical* injuries, specifically including the permanent shoulder injury that was allegedly caused by Piraino's retaliation against her in 2020 when she refused his demands, this claim is time-barred.

In response, the plaintiffs point out that, under Tennessee law, medical expenses are specifically defined as a form of "economic damages." *See, e.g.*, Tenn. Code Ann. §§ 29-39-

101(1), 29-39-103(a)(1). The parents expressly disclaim any intent to seek "damages other than those to which they are entitled by law," and the FAC makes it clear that medical expenditures are the only type of economic damages they seek. (*See* Doc. No. 36 ¶¶ 142, 154, 179, 194.) The defendants' Motions to Dismiss premised upon an assumption that the parents seek other categories of damages than those that they are statutorily entitled to seek will be denied.

Regarding the defendants' argument that the portion of such economic damages related to Jane Doe's shoulder injury is time-barred, the court is not persuaded. As an initial matter, the court notes that the statute of limitations is an affirmative defense on which defendants bear the burden of proof, and plaintiffs are not required to plead facts to avoid the application of a statute of limitations in order to state a claim. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). For that reason, "a motion under Rule 12(b)(6), which considers only the allegations in the complaint, is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations." *Id.* However, if "the allegations in the complaint affirmatively show that the claim is time-barred," then dismissal "under Rule 12(b)(6) is appropriate." *Id.*

The FAC alleges that Piraino's actions caused permanent damage to Jane Doe's shoulder, insofar as he made her perform painful exercises as punishment for not complying with his sexual demands. (Doc. No. 36 ¶¶ 115–17.) The injury occurred sometime in 2020, and the parents were clearly aware of the injury no later than December 2020, because the FAC alleges that Jane Doe took time off from fencing around that time to allow her shoulder time to heal. (*Id.* ¶ 122.) The entity defendants argue that, because the plaintiffs knew of this injury and did not file suit until July 2022, it appears from the face of the FAC that the parents' claim for medical damages related to the shoulder injury is barred by Tennessee's one-year statute of limitations, Tenn. Code Ann. § 28-3-104(a).

MCFC also argues that the FAC alleges that Jane Doe allegedly sent dozens of photographs of herself to Piraino beginning in 2019 and that the parents knew or should have known about this, because the FAC does not allege that the parents "did not have possession or control of their child's cell phone at the time that these communications purportedly occurred."[3] (Doc. No. 42, at 9.) MCFC appears to be asserting on this ground that the entirety of the parents' damages claims related to the medical or psychiatric care of Jane Doe incurred by the parents arising from Piraino's abuse (and not just the damages related to her shoulder injury) are time-barred.[4]

Tennessee, however, follows the "discovery rule," under which the limitations period does not start running until the plaintiff discovers, or in the exercise of reasonable care and diligence should have discovered, both the *injury* and the *source* of the injury. *Redwing v. Cath. Bishop for Diocese of Memphis*, 363 S.W.3d 436, 458–59 (Tenn. 2012). The parents specifically allege that the communications between Jane Doe and Piraino primarily took place via SnapChat, which meant that the photographs and communications between them disappeared following receipt. (Doc. No. 36, at 22 n.12.) They allege that they did not know about the communications. (*Id.* ¶ 92.) For purposes of the defendants' motions based on the statute of limitations, the factual allegations in the FAC do not establish that the parents knew or reasonably should have known prior to Jane Doe's disclosure of her abuse to her psychotherapist that their daughter had suffered physical and emotional injuries as a result of wrongful conduct. The lawsuit was filed within a year of the date of Jane Doe's disclosure of the abuse. Dismissal of the parents' damages claims

---

[3] MCFC absurdly argues that the plaintiffs' claims accrued in 2017, because the Judgments entered against Piraino states that his criminal offenses began in 2017. (*See* Doc. No. 42, at 3, 8–9 (citing Doc. No. 41-1).) The plaintiffs clearly allege, however, that the abuse of Jane Doe did not begin until 2019.

[4] MCFC also asserts that the plaintiffs fail to allege when the parents discovered the abuse of Jane Doe, but, again, the plaintiffs had no obligation to plead to avoid the application of the statute of limitations.

on statute of limitations grounds, therefore, is not warranted.

### 2.    *The Intentional Infliction of Emotional Distress Claim Against MCFC*

MCFC also asserts that the parents' IIED claim is time-barred for the same reasons, but the same statute of limitations analysis applies. MCFC's motion will be denied, insofar as it seeks dismissal of the IIED claim based on the running of the one-year statute of limitations.[5]

### 3.    *Jane Doe's Claims Under 18 U.S.C. § 1595(a)*

The plaintiffs bring claims on behalf of Jane Doe against USA Fencing and MCFC under various federal laws aimed at punishing sex traffickers as well as entities and individuals complicit in sex trafficking. The entity defendants seek dismissal of these claims.[6]

Congress initially passed the Trafficking Victims Protection Act of 2000 ("TVPA") "[t]o combat trafficking in persons, especially into the sex trade, slavery, and involuntary servitude, to reauthorize certain Federal programs to prevent violence against women, and for other purposes." Victims of Trafficking and Violence Protection Act of 2000, PL 106–386 (Division A), Oct. 28, 2000, 114 Stat 1464. The legislation created criminal offenses for sex trafficking and forced labor. 18 U.S.C. §§ 1591(a), 1589(a). Sex trafficking, as relevant here, is defined to include the knowing enticement or solicitation of a person under the age of 18 years to "engage in a commercial sex act." *Id.* § 1591(a). Forced labor is defined to include obtaining the labor or services of an person by means of force or threats of force. *Id.* § 1589(a).

---

[5] The damages sought by the parents in association with the IIED claim are the same medical damages sought in connection with the other claims set forth in the FAC. The FAC does not appear to set forth an independent IIED claim on behalf of the parents, as it nowhere alleges that the parents, as opposed to Jane Doe, suffered "serious mental injury" as a result of any defendant's conduct (including Piraino's), which is one of the necessary elements of an IIED claim. *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 210 (Tenn. 2012).

[6] Both entity defendants seek dismissal of the plaintiffs' claims against them for violating 18 U.S.C. §§ 1591(a), 1594, and 1589(a), but the FAC does not state claims against them under the criminal statutes; as explained herein, it asserts claims against them under § 1595(a).

A few years later, Congress enacted the Trafficking Victims Protection Reauthorization Act ("TVPRA") to provide a civil remedy to victims of violations of the TVPA.[7] 18 U.S.C. § 1595(a). The civil remedy statute states in relevant part:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595.[8] Thus, under the TVPRA, a victim of sex trafficking or forced labor under the TVPA may bring (a) a direct civil claim against the perpetrator of her trafficking and (b) a "beneficiary" civil claim against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPA]." 18 U.S.C. § 1595(a).

Although the Sixth Circuit has not had the opportunity to do so, the Eleventh Circuit Court of Appeals articulated the elements of a TVPRA beneficiary claim in *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021). To state a claim for beneficiary liability under the TVPRA, a plaintiff must plausibly allege that the defendant:

> (1) knowingly benefited, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that undertaking or enterprise violated the [TVPA] as to the plaintiff, and (4) the defendant had constructive or actual knowledge that the undertaking or enterprise violated the [TVPA] as to the plaintiff.

---

[7] For purposes of the Motions to Dismiss, there is no dispute that Jane Doe is a victim of Piraino's violation of the TVPA. He induced Jane Doe to engage in "commercial sex acts," as contemplated by § 1591(a), when he gave her money and other things of value in exchange for her providing him with sexually explicit images. (Doc. No. 36 ¶¶ 97–99, 113, 198.) And he violated § 1589(a) when he allegedly "punished" her for refusing to comply with his demands for sexually explicit materials by "making" her perform exercises that exacerbated her shoulder injury. (Doc. No. 36 ¶¶ 115, 214.)

[8] Minor amendments in 2023 to this provision are not material to the plaintiffs' claims.

*Id.* at 726. In order for Jane Doe's TVPRA beneficiary claim to survive USA Fencing's and MCFC's motion to dismiss, the plaintiffs must plausibly allege facts sufficient to satisfy each of these four elements.

a)     *"Knowingly Benefited" from Participation in "Common Undertaking or Enterprise"*

Courts have struggled with the standards to be applied to this section and to the definition of a common undertaking or venture. The plaintiffs here allege that USA Fencing knowingly participated in a "venture" with Piraino when it allowed him to act as an agent for the organization, hired him as Region 6 Coordinator, allowed him to serve as chair of an administrative division within the organization, and approved him and his fencing club as members of the organization. (Doc. No. 36 ¶¶ 202, 217.) They allege that USA Fencing financially benefited from this arrangement, insofar as Piraino provided valuable services to the organization, and it was through his actions that USA Fencing received dues from the coaches and fencers at MCFC. (*Id.* ¶¶ 204, 219.) Similarly, the plaintiffs allege that MCFC knowingly participated in a venture with Piraino, because Piraino was the "sole owner, officer, and director of Music City Fencing and exercised control over the management of the company." (*Id.* ¶¶ 203, 218.) And MCFC allegedly benefited financially by accepting Piraino's services as an officer and agent of MCFC and through the payment of dues and other fees from students and coaches who participated in fencing through MCFC. (*Id.* ¶¶ 205, 220.) The defendants do not effectively dispute that they were engaged in common undertakings with Piraino; they simply dispute that they were engaged in a sex trafficking venture with him.

But that question does not enter into the equation at this step in the inquiry. For purposes of these two factors, the plaintiffs adequately allege that USA Fencing and MCFC knowingly benefited from engaging in a common venture with Piraino—a common venture involving the

promotion and coaching of the sport of fencing. Courts confronted with beneficiary claims against hotels in which sex trafficking has occurred, for instance, have held that "the rental of a room in exchange for money constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard." *J.C. v. I Shri Khodiyar, LLC*, 624 F. Supp. 3d 1307, 1316 (N.D. Ga. 2022) (citation omitted) (collecting cases).

        b)    *Constructive or Actual Knowledge that the Undertaking or Enterprise Violated the TVPRA as to the Plaintiff.*

As explained in note 7, *supra*, there is effectively no dispute for purposes of the Motions to Dismiss that the ventures in which the entity defendants engaged with Piraino violated the TVPA as to Jane Doe, because Piraino personally used the common ventures—that is, he took advantage of his position as a coach and person of authority within the organizations—to knowingly entice Jane Doe to engage in commercial sex acts within the contemplation of 18 U.S.C. § 1591(a) (by providing her with money and things of value in exchange for sexually explicit images) and to obtain "labor or services" from her by means of force or threats of force, within the scope of § 1589(a) (by inflicting physical punishment on her when she refused to comply with his demands).[9] The question, then, is whether the plaintiffs adequately allege that USA Fencing and MCFC knew or should have known that the common enterprises violated the TVPA *as to the plaintiff. See Doe #1*, 21 F.4th at 726.

Regarding USA Fencing specifically, the FAC contains numerous allegations about the problem of sex abuse generally in youth sports, as well as allegations about a single complaint brought to USA Fencing's attention in 2017 that Piraino had engaged in inappropriate contact with an adult college student during a fencing competition at which the complainant was a referee. The

---

[9] The plaintiffs also allege that Piraino violated 18 U.S.C. § 1594. That provision simply criminalizes attempts to violate the substantive provisions of the TVPA.

plaintiffs allege that USA Fencing was negligent insofar as it knew about a potential problem involving the sexual abuse of minors generally and that it failed to take effective steps to minimize opportunities for such abuse and also to facilitate the reporting and detection of such abuse when it occurs. They also allege that Piraino engaged in other misconduct that USA Fencing either knew about or should have known about but that does not amount to sexual misconduct. The plaintiffs' negligence claims against of USA Fencing related to Piraino's perpetration of abuse generally is addressed below. For purposes of the TVPRA, however, as indicated above, the plaintiffs must show that USA Fencing knew or should have known that Piraino's activities constituted sex trafficking or forced labor as to Jane Doe.

As USA Fencing points out, even Jane Doe's parents did not know about Piraino's sexual abuse of their daughter until months after the abuse had ceased, as he took great pains to ensure the secrecy of his activities. In cases in which courts have found hotels liable under a beneficiary theory, the plaintiffs have pointed to specific activities that should have put the hotels on notice of the specific trafficking of the victims, rather than merely the risk of trafficking in general. *See, e.g.*, *J.C.*, 624 F. Supp. 3d at 1317 (recognizing that, while courts have "grappled with the question of what conduct constitutes a defendant's participation in a venture under § 1595(a), . . . the factor that appears to differentiate plaintiffs who adequately state TVPRA beneficiary claims from those who do not is that the successful plaintiffs 'connect the dots' between the plaintiff's traffickers and the specific defendant in the case" and that one way to do this is to "allege a 'continuous business relationship' between a defendant hotel and a sex trafficker where the defendant rented rooms to people it knew or should have known were engaged in sex trafficking" (collecting cases)); *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 193 (E.D. Pa. 2020) ("A.B.'s amended complaint inartfully includes numerous allegations regarding the problem of sex trafficking generally . . . . If

A.B. made only these allegations, we [might] agree with Marriott. But A.B. also specifically alleges A.B.'s trafficking in and through three identified Marriott branded hotels. . . . [B]etween 2009–2011, A.B.'s traffickers used Marriott's three Philadelphia Airport hotels to sell illegal sex acts; as many as six men an evening entered each of the three hotels as an "unannounced guest," creating a "voluminous and obvious" constant stream of male visitors to A.B.'s rooms accessed through the front door and main lobby of the hotels; A.B.'s trafficker repeatedly paid for rooms at each of the three hotels for at least a week at a time with prepaid credit cards and hotel staff were aware of A.B.; when A.B.'s trafficker brought her to the hotels, she presented with little, if any, luggage, no phone, wallet, or identification, and when checking A.B. into the hotel, he would not proceed to the room; rooms rented for trafficking were littered with multiple broken objects, used condoms, and other sex paraphernalia which would have been noticed by staff; and staff at all three hotels observed A.B. with signs of visible injury on more than one occasion, frequent loud altercations, and attacks on A.B. by her trafficker were constant and loud enough for hotel patrons and staff to hear. . . . We find these allegations plausibly allege Marriott knew or should have known of a sex trafficking venture involving A.B. at its three Philadelphia Airport hotels.").

The plaintiffs here do not point to any such specific and obvious signs that, if USA Fencing had been paying attention, would have alerted it to Piraino's sex trafficking of Jane Doe. That USA Fencing knew or should have known that Piraino had allegedly groped an adult woman in 2017, allegedly engaged in "belligerent and unethical behavior at fencing tournaments" (Doc. No. 36 ¶ 61), and had been arrested in 2015 for public intoxication (*id.* ¶ 66) may have put it on notice that Piraino was generally a bad guy and a poor ambassador for the sport, but not that he was engaged in acts that constituted the sex trafficking of Jane Doe.

Apparently recognizing this deficiency, the plaintiffs premise USA Fencing's beneficiary

liability under the TVPRA on their allegations that Piraino was USA Fencing's "agent" and that "USA Fencing knew that Piraino was engaged in conduct that violated [the TVPA] because . . . Piraino's knowledge of his own behavior is legally imputed to USA Fencing as an agent of the organization." (Doc. No. 36 ¶¶ 206, 221.) USA Fencing argues that the factual allegations in the FAC fail to establish that Piraino was acting as USA Fencing's agent when he, unbeknownst to USA Fencing, engaged in illegal activity and that Piraino's knowledge of his own wrongdoing cannot be imputed to USA Fencing under the circumstances presented here.

In other words, the parties consider this issue to be determined by agency law, with the decision turning on whether Piraino's knowledge that he was sexually abusing Jane Doe should be imputed to USA Fencing. Regarding this argument, courts generally have found that vicarious or indirect liability may be available under the TVPRA. *See, e.g.*, *Treminio v. Crowley Mar. Corp.*, No. 3:22-CV-174-MMH-PDB, 2023 WL 113565, at *4 (M.D. Fla. Jan. 5, 2023) (collecting cases). Federal common law agency principles apply to such claims. *See, e.g.*, *J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1064 (D. Colo. 2021); *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 939 (D. Or. 2020).

The Sixth Circuit has recognized that the "general rule is that notice to or knowledge of an agent may be imputed to the principal . . . where the agent is acting within the scope of his authority and the knowledge pertains to matters within the scope of the agent's authority." *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 457 (6th Cir. 1982) (citing *Curtis, Collins & Holbrook Co. v. United States*, 262 U.S. 215 (1923); *Anderson v. Gen. Am. Life Ins. Co.*, 141 F.2d 898 (6th Cir. 1944)). However, under the "adverse-interest exception," "notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another

person." *In re Fair Fin. Co.*, 834 F.3d 651, 677 (6th Cir. 2016) (quoting Restatement (Third) of Agency § 5.04). The plaintiffs do not plausibly allege that Piraino was acting within the scope of his authority or for the benefit of USA Fencing when he engaged in conduct that fits the definition of sex trafficking in violation of § 1591(a) or forced labor in violation of § 1589(a).

However, basically every jurisdiction confronted with the issue has also recognized an exception to the adverse-interest exception, known as the "sole-representative doctrine." *See Mann v. Adventure Quest, Inc.*, 974 A.2d 607, 612 (Vt. 2009) (finding "no jurisdiction that has refused to adopt [the doctrine], at least in modern times" (citations omitted)). This doctrine may apply "when an adverse agent is the sole representative of the principal." *Id.* (citing 3 W. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 819, at 104–08 (2002)). The rationale for the rule is that, when a corporation has only one representative, that sole representative has "no one to whom to impart his or her knowledge and no one from whom he or she may conceal it. In general, this is another way of stating that the agent is *de facto* the principal." *Id.* (quoting Fletcher, § 827.10, at 143; citing *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 165 (2d Cir. 2003)).

The plaintiffs assert that this doctrine applies to USA Fencing, but the factual allegations in the FAC do not support their claim. The plaintiffs themselves allege that USA Fencing is the "national governing body for the sport of fencing in the United States," that it is a non-profit corporation whose principal place of business is in Colorado Springs, Colorado, and that it is a multi-million dollar business with 700 approved fencing clubs around the country and more than 30,000 dues-paying members. (Doc. No. 36 ¶¶ 7, 17, 18.) Its operations are organized by region, and the regions are made up of State divisions. (*Id.* ¶¶ 12, 19, 20.) The allegations make clear that USA Fencing has a national office and a board of directors—of which Piraino is not alleged to

have ever been a member. He is not an officer or manager of USA Fencing. Rather, he runs one member club. Beginning in 2014, he acted as Chair of USA Fencing's Tennessee division, and at some point before he began abusing Jane Doe, he was allegedly "hired" by USA Fencing as its Region 6 Coordinator, a two-year position. (*Id.* ¶ 47.) These allegations firmly establish that there were others within USA Fencing to whom Piraino could have imparted his own knowledge of his wrongdoing and others from whom he actively sought to conceal it. The facts as alleged in the FAC do not remotely suggest that Piraino so "control[led] and dominate[d]" USA Fencing that he effectively acted as its alter ego. *Mann*, 974 A.2d at 612.[10] Accordingly, the FAC fails to state a claim for which relief may be granted as to USA Fencing under 18 U.S.C. § 1595(a), with respect to Piraino's alleged violations of the TVPA.

But the same analysis does not necessarily apply to MCFC. Piraino is alleged to be the founder, sole owner, principal, director, and former head coach of MCFC, as well as its agent for service of process. (Doc. No. 36 ¶¶ 6, 39, 41.) He was purportedly

> responsible for the management of the company and made all decisions relating to finances, personnel, leases, equipment acquisitions, and policies and procedures governing the company's day-to-day operations, including the adoption, implementation, and enforcement of the company's policies and procedures relating to the prevention and detection of sexual abuse.

(*Id.* ¶ 41.) In this role, he allegedly had "complete control over the operations and management" of MCFC, and the corporation itself placed no "limits on Piraino's authority or ability to act on behalf of the company." (*Id.* ¶ 43.) The court finds that these allegations, if found to be true, would

---

[10] The sole actor exception may also apply in a situation where "one person acts as the only agent representing the principal's interest in a particular transaction." *Id.* at 614 (citing *Curtis, Collins & Holbrook Co. v. United States*, 262 U.S. 215, 222 (1923)). Even assuming the Sixth Circuit would recognize this exception, it only applies when the "principal seeks to retain a benefit that the agent has procured for the principal." *Id.* at 615. "[T]he rule merely applies principles of estoppel, ratification or restitution in cases involving claims to property." *Id.* (citation omitted). It does not apply in this case.

be sufficient to establish that the sole-representative exception to the otherwise applicable adverse-interest exception applies with respect to Piraino's relationship with MCFC. *Mann*, 974 A.2d at 612. That is, the allegations support an inference that Piraino "control[led] and dominate[d]" MCFC to such an extent that his knowledge of his own wrongdoing may be imputed to MCFC. *Id.*

MCFC appears to argue that this exception cannot apply because it would suggest that there was no "common venture," because Piraino was effectively in a sex-trafficking venture only with himself. (*See* Doc. No. 42, at 13 ("Because Plaintiffs' Amended Complaint does not allege that 'two or more people' engaged in a sex trafficking venture involving MCFC, Plaintiffs' [TVPA] claim against MCFC fails as a matter of law.").) While this argument has some logical appeal, that Piraino may have dominated and controlled MCFC to such an extent that his knowledge of his own wrongdoing may be imputed to MCFC would not mean that MCFC did not exist as a separate corporate entity with which Piraino was engaged in a common venture involving the promotion and teaching of fencing. It simply means that MCFC is charged with knowing that Piraino was using MCFC, the enterprise, to engage in sex trafficking.

MCFC, moreover, conflates the standards applicable to criminal claims under the TVPA and those applicable to civil claims under the TVPRA, when it asserts—incorrectly—that the Sixth Circuit has defined the term venture, "as contemplated by 18 U.S.C. § 1595(a)," as requiring "[t]wo or more people who engage in sex trafficking together." (Doc. No. 42, at 13 (quoting *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016)).) *Afyare* was a criminal case, and the court in that case defined the term "venture" for purposes of § 1591(a)(2). *Afyare*, 632 F. App'x at 286. Criminal liability requires knowing participation in a sex-trafficking venture. *See id.* ("We . . . find that § 1591(a)(2) targets those who participate in sex trafficking."). Civil liability under § 1595(a)

requires simply knowingly benefiting from participation in any "venture"—not necessarily a sex-trafficking venture—that the defendant "knew or should have known" has engaged in an act in violation of the TVPA. *Accord A.B.*, 455 F. Supp. 3d at 188 (distinguishing between the terms "participation in a venture" as used in § 1591 and § 1595).

In sum, the court will dismiss the § 1595(a) claims against USA Fencing, but MCFC's motion to dismiss the § 1595(a) claims against it will be denied.

### 4. *Jane Doe's Negligence and Negligent Supervision Claims*

USA Fencing also seeks dismissal of Jane Doe's negligence claims against it on the basis that the allegations "are devoid of the factual underpinnings necessary to establish that USA Fencing owed any duty to Jane Doe" and, alternatively, on the basis that the allegations fail to establish that USA Fencing's actions were the proximate cause of Jane Doe's injuries.[11] They also argue that the FAC fails to assert any viable basis for respondeat superior liability on the part of USA Fencing.

### a) *Additional Facts Relating to Negligence Claims*

In support of their negligence-based claims, the plaintiffs allege that USA Fencing has long been aware of the risk of sexual abuse in youth sports and has actual knowledge that numerous members of the youth fencing community have been sexually assaulted or abused while participating in USA Fencing-sponsored activities. In addition to knowledge of this general risk, the plaintiffs allege that, in February 2017, a female collegiate athlete and member of USA Fencing filed a written complaint with USA Fencing, alleging that Piraino had touched her breasts without

---

[11] MCFC was granted leave to "join" in USA Fencing's Motion to Dismiss "to the extent applicable." (Doc. No. 46, at 1.) Because MCFC did not raise any arguments about the viability of the negligence claims against it specifically, and because the court finds that USA Fencing's arguments are not factually "applicable" to MCFC, the court does not construe MCFC's joinder in USA Fencing's Motion to Dismiss as seeking dismissal of the negligence claims against it.

her consent during a fencing tournament in Tennessee at which she was serving as a referee. The event was organized and managed by Piraino in his capacity as Tennessee Division Chair. (*Id.* ¶¶ 75–77.) Shortly after the woman filed her complaint, in which she explained the incident in detail and provided contact information for a witness, USA Fencing contacted her and told her she needed to submit the complaint under the category of "physical misconduct" rather than "sexual misconduct." (*Id.* ¶¶ 77–78.) She resubmitted the form and then had a telephone conversation with USA Fencing's then CEO on March 3, 2017. During this call, the woman again explained the incident in detail. (*Id.* ¶ 80.)

On the same date, the U.S. Center for SafeSport ("SafeSport") went "on line." (*Id.* ¶¶ 29, 81.), SafeSport is a separate entity chartered and established by the U.S. Olympic and Paralympic Committee to support the national governing bodies of Olympic sports, including USA Fencing, in preventing and responding to sexual abuse. (*Id.* ¶ 29.) As of March 3, 2017, member entities, including USA Fencing, agreed to be bound by the policies and procedures issued by SafeSport relating to the prevention of sexual abuse. (*Id.*) According to the plaintiffs, one of SafeSport's requirements is that all complaints of sexual misconduct be referred to SafeSport. (*Id.* ¶ 32.) The plaintiffs allege that the reason USA Fencing required the complainant to resubmit her complaint under the category "physical misconduct" rather than "sexual misconduct" was to avoid having to refer the complaint to SafeSport. (*Id.* ¶ 81.) USA Fencing, in any event, allegedly ignored the complaint, never investigated further, and never took any action against Piraino as a result of it.

The plaintiffs allege, based on USA Fencing's general knowledge of the risk of sexual abuse of young people and its specific knowledge of this single complaint against Piraino, that it was foreseeable that young fencers like Jane Doe would be sexually abused if USA Fencing "did not take measures to prevent sexual abuse from occurring" and to detect it when it did occur. (*Id.*

¶ 157.) They allege that, in light of this foreseeable risk, USA Fencing "was in a special relationship with young fencers, including Jane Doe," and "had a duty of reasonable care to protect them from being sexually abused by their fencing coaches." (*Id.* ¶ 158.) They also allege that it had a "special relationship" with Piraino, having approved him as a coach, approved MCFC as a "premium member club," allowed Piraino to chair the division of USA Fencing that oversaw operations in Tennessee, and authorized him to act as USA Fencing's "agent" "with regard to young fencers." (*Id.* ¶ 159.) They assert that, because he was USA Fencing's "agent," USA Fencing had a duty to supervise him. (*Id.* ¶ 160.) They further allege that, by granting him various national awards and commendations, it "assumed a duty of reasonable care to ensure that the representations it was making about Piraino were accurate." (*Id.* ¶ 161.)

The plaintiffs assert that USA Fencing breached its duties to Jane Doe and her parents by (1) ignoring the 2017 complaint of inappropriate sexual contact and failing to take steps to avoid scrutiny of the complaint by SafeSport; (2) failing to conduct a reasonable investigation into Piraino's background and reputation before making him a member coach and showering him and his club with national awards; (3) failing to monitor his compliance with USA Fencing's policies and procedures relating to the prevention and detection of child abuse; (4) failing to implement and enforce policies and procedures limiting direct, unsupervised one-to-one contact or communications between coaches and minor fencers, which failure also violated federal law; (5) failing to provide minor fencers and their families with information or training relating to the prevention, detection, and reporting of child abuse, which failure also violated federal law; and (6) failing to investigate Piraino's conduct after purportedly coming into possession of information that he was engaged in sexually inappropriate and abusive behavior with young fencers. (*Id.* ¶¶ 167–73.) They allege generally that USA Fencing knew or should have known that Piraino was

unfit as a head coach, Tennessee Division Chair, and Regional Coordinator, both because it had actually received the 2017 complaint about sexually inappropriate conduct during a fencing tournament and because Piraino acted as an agent of USA Fencing, such that his knowledge of his own misconduct is imputed to the organization. They further assert that, even if USA Fencing did not know, it should and would have known if it had not breached its duties to Jane Doe and her parents. And that if it had not breached its duties, Piraino would not have been in a position to abuse Jane Doe, or his abuse would have been detected sooner.

<i>b)     Existence of a Duty</i>

A negligence claim under Tennessee law requires proof of each of the following elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate or legal cause." *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 819 (Tenn. 2008). Duty, the first element of the claim, is defined as the "legal obligation owed by defendant to plaintiff to conform to a reasonable person standard of care for the protection against unreasonable risks of harm." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). "Whether a defendant owes a duty to a plaintiff in any given situation is a question of law for the court." *Riggs v. Wright*, 510 S.W.3d 421, 427 (Tenn. Ct. App. 2016).

"Generally speaking, persons have a duty to others to refrain from engaging in affirmative acts that a reasonable person should recognize as involving an unreasonable risk of causing an invasion of an interest of another or acts which involve an unreasonable risk of harm to another." *Id.* (internal quotation marks and alteration omitted); *see also* Restatement (Second) of Torts ("Restatement") §§ 284, 302, at 19, 82 (1965)). However, this "general duty of care does not include an affirmative duty to act for the protection of another—including a duty to protect another from a third party's criminal acts—"unless the defendant 'stands in some special relationship to

either the person who is the source of the danger, or to the person who is foreseeably at risk from the danger.'" *Biscan v. Brown*, 160 S.W.3d 462, 478–79 (Tenn. 2005) (quoting *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997)); *see also* Restatement § 315. The special relationship doctrine "recognizes that certain socially recognized relations exist which constitute the basis for such legal duty." *Id.* at 479 (internal quotation marks and citation omitted).[12]

In Tennessee, to determine whether such a special relationship exists and, therefore, whether a defendant owed a duty to act to protect the plaintiff, courts are to weigh public policy considerations, as well as whether "the plaintiff's injuries and the manner in which they occurred were reasonably foreseeable." *Id.* In addition, courts must consider the factors that generally apply to the determination of whether a defendant owed a duty of care to a particular plaintiff, including:

> the foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; the usefulness of the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct.

*Id.* at 80 (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). The foreseeability prong of the balancing test "is paramount because '[f]oreseeability is the test of negligence.'" *Id.* (quoting *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992)) (alteration in original).

The Tennessee Court of Appeals applied this test in *Ms. B. v. Boys & Girls Club of Middle Tennessee*, No. M2013-00812-COA-R3CV, 2014 WL 890892 (Tenn. Ct. App. Mar. 6, 2014), in which the plaintiff brought suit on her own behalf and that of her minor child, in connection with

---

[12] Tennessee courts "have previously recognized such special relationships to include those of innkeeper and guest, common carrier and passenger, possessors of land and guests, social host and guest, and those who have custody over another." *Downs*, 263 S.W.3d at 819. But this list of recognized special relationships is "not exhaustive." *Main St. Mkt., LLC v. Weinberg*, 432 S.W.3d 329, 337 (Tenn. Ct. App. 2013).

damages arising from the sexual abuse of the minor child by a volunteer mentor with Boys and Girls Clubs of Middle Tennessee, in association with Big Brothers Big Sisters of Middle Tennessee ("BBBSMT"). The plaintiff sued the mentor and these entitles, but she also sued the national organization, Big Brothers Big Sisters of America ("BBBSA"). The trial court granted summary judgment to BBBSA. Although the trial court did not explain its holding, it was undisputed that BBBSA "moved for summary judgment based solely on the element of duty," as a result of which the appellate court "perceive[d] the absence of duty to provide the legal basis for the court's ruling." *Id.* at *3. Because the parties agreed that the trial court's determination was based on its "conclusion that BBBSA exercised no control over the operations of its Tennessee affiliate," the Tennessee Court of Appeals considered that the issue before it was whether the trial court erred in finding that BBBSA did not owe a duty to the plaintiffs because it did not have "the means and ability to control the operations of BBBSMT." *Id.* BBBSA, in that regard, argued that it had no "special relationship" with its affiliates, because the membership agreements stated that it did not control the affiliates' day-to-day operations. *Id.*

The appellate court reversed. As particularly relevant here, regarding the foreseeability of the harm at issue and several of the other factors relevant to the determination of whether a special relationship existed between BBBSA and BBBSMT, the court stated:

> The plethora of litigation, both civil and criminal, arising from alleged sexual abuse of children by persons in authority, in addition to the attention provided to this social evil by the media and throughout every strata of society, renders the alleged abuse in this case entirely foreseeable. There can be no doubt that the risk of harm alleged in this case is foreseeable. There also is no doubt that the gravity of harm is great. We have consistently emphasized that suspicions of sexual child abuse must be taken seriously and . . . investigated thoroughly, for the consequences to the child of allowing any abuse to continue are grave. As a matter of public policy, moreover, the prevention of child sexual abuse is a priority in Tennessee.[13]

---

[13] *See* Tenn. Code Ann. § 37-1-601(a) (2014) ("The incidence of child sexual abuse has a tremendous impact on the victimized child, siblings, family structure, and inevitably on all citizens

*Id.* at *5 (internal citations omitted). The court found that these factors "weigh[ed] heavily in favor of imposing a duty of care on BBBSA to supervise its affiliates so as to protect against sexual child abuse." *Id.* at *8.

Thus, the question of whether BBBSA had a duty to take reasonable measures to prevent the sexual abuse of children participating in programs offered by BBBSMT "turn[ed] on whether BBBSA possesse[d] the means and ability to control the affiliate's operations." *Id.* at *6; *see Mann v. Alpha Tau Omega Fraternity, Inc.*, W2012-00972-COA-R3-CV, 2013 WL 1188954, at *3 (Tenn. Ct. App. Mar. 22, 2013) ("[I]n order for the duty to control a third party's conduct to arise, the actor must have the means and ability to control the third party." (quoting *Newton v. Tinsley*, 970 S.W.2d 490, 493 (Tenn. Ct. App. 1997)). The court reversed and remanded based on its finding that BBBSA had "failed to carry its burden in this case to affirmatively demonstrate that it did not possess the means and ability to control the acts of BBBSMT for the purposes of affirmatively negating [the plaintiff's] claims" of negligence, including negligent supervision, screening, and monitoring of the mentor, negligent failure to ensure a safe environment, and negligent failure to ensure that the employee assigned to match the minor child with a mentor was "complying with organizational policy and procedures." *Id.* at *8.[14]

---

of this state, and has caused the general assembly to determine that the prevention of child sexual abuse shall be a priority of this state.").

[14] The placing of the burden of proof on BBBSA was consistent with Tennessee's summary judgment standard in effect at the time, pursuant to which the moving party could satisfy its burden of showing that it was entitled to judgment as a matter of law by "affirmatively negat[ing] an essential element of the nonmoving party's claim" or "demonstrate[ing] that the nonmoving party cannot establish an essential element of his case." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 257 (Tenn. 2015) (quoting *Byrd v. Hall*, 847 S.W.2d 208, 215 n.5 (Tenn. 1993)); *see Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 8 (Tenn. 2008) ("[A] moving party's burden of production in Tennessee differs from the federal burden. It is not enough for the moving party to challenge the nonmoving party to 'put up or shut up' or even to cast doubt on a party's ability to prove an element at trial."). Tennessee did not overrule *Hannan* and adopt the federal standard until 2015, in *Rye*, 477 S.W.3d at 264.

Somewhat closer to home factually, if not geographically, in *Brown v. USA Taekwondo*, 253 Cal. Rptr. 3d 708, 715 (2019) ("*Brown I*"), *aff'd*, 483 P.3d 159 (2021) ("*Brown II*"), three athletes brought suit against their taekwondo coach, the fitness center owned and operated by the coach, the United States Olympic Committee ("USOC"), and USA Taekwondo, the national governing body for the Olympic sport of taekwondo, asserting claims arising from the coach's sexual abuse of the three athletes while they were minors. The USOC and USA Taekwondo filed the California equivalent of motions to dismiss the claims against them for negligence in failing to protect the plaintiffs from abuse by their coach. The trial court granted the motions, but the California Court of Appeal reversed in part, finding that the plaintiffs adequately alleged facts supporting the existence of a duty on the part of USA Taekwondo to protect them, but it affirmed the dismissal of the claims against the USOC.

The negligence claims against USA Taekwondo and USOC were based on the alleged breach of a "duty of reasonable care to enforce or enact a [c]ode of ethics for the sport of taekwondo and to enact policies and procedures both to enforce the [c]ode and to protect female athletes from sexual assault and molestation by coaches and persons in authority." *Brown I*, 253 Cal. Rptr. 3d at 722. The entity defendants denied owing the plaintiffs any duty of care.

Under California law, as in Tennessee, the general rule is that "there is no duty to act to protect others from the conduct of third parties." *Id.* (citation omitted). Again as in Tennessee, a person may have an affirmative duty to protect the victim of another's harm if that person is in a "special relationship" with either the victim or the third person. *Id.* at 723. "A special relationship between the defendant and the victim is one that gives the victim a right to expect protection from the defendant, while a special relationship between the defendant and the dangerous third party is one that entails an ability to control [the third party's] conduct." *Brown II*, 483 P.3d at 165

(citations and internal quotation marks omitted; alteration in original); *see also Brown I*, 253 Cal. Rptr. 3d at 722–23. Under California law, a plaintiff alleging that the defendant had a duty to protect her must establish: (1) that an exception to the general no-duty-to-protect rule applies, for instance, that a special relationship exists, and (2) that the factors enumerated in *Rowland v. Christian*, 443 P.2d 561 (Cal. 1968), support the imposition of the duty. *Brown I*, 253 Cal. Rptr. 3d at 723.[15]

The court found that the plaintiffs adequately alleged facts showing that USA Taekwondo had a special relationship with Gitelman, the plaintiffs' abusive coach. The plaintiffs alleged as follows:

> To compete at the Olympic games, taekwondo athletes must be members of [USA Taekwondo] and train under USAT-registered coaches. [USA Taekwondo] registered Gitelman as a coach, and he remained registered until USAT banned him from coaching. [USA Taekwondo] had control over Gitelman's conduct through its policies and procedures. As the national governing body of taekwondo, "[USA Taekwondo] is responsible for the conduct and administration of taekwondo in the United States." Further, [USA Taekwondo] formulates the rules, implements the policies and procedures, and enforces the code of ethics for taekwondo in the United States.
>
> In the late summer of 2013 [USA Taekwondo] adopted codes of conduct and ethics that complied with the requirements of the safe sport program mandated by USOC. [USA Taekwondo]'s code of conduct prohibits sexual relationships between coaches and athletes. [USA Taekwondo]'s code of ethics prohibits, among other things, provision of alcohol to youth athletes, inappropriate touching between a coach and an athlete, and nonconsensual physical contact. [USA Taekwondo] can, and did, enforce its policies and procedures by temporarily suspending Gitelman pending the ethics committee hearing, conducting a hearing in October 2013 on Brown's sexual abuse allegations against Gitelman, and terminating Gitelman's USAT membership in September 2015.

*Id.* at 725. Based on these allegations, the court found that USA Taekwondo was "in the best

---

[15] The California Supreme Court accepted review of the decision solely to affirm that portion of the appellate court's holding. *See Brown II*, 483 P.3d at 161 (affirming that the determination whether to recognize such a duty requires that two-step inquiry).

position to protect against the risk of harm" and to "meaningfully reduce the risk of the harm that actually occurred." *Id.* (citations omitted). As such, it "had a special relationship with the foreseeably dangerous person that entails an ability to control that person's conduct." *Id.* (citations omitted).

Finding that a special relationship existed between USA Taekwondo and the coach, the court weighed the *Rowland* factors to determine whether they supported limiting the scope of the duty owed by USA Taekwondo. These factors include:

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Id.* at 726 (quoting *Rowland*, 443 P.2d at 564). As the court explained, the *Rowland* factors are to be "'evaluated at a relatively broad level of factual generality.' In considering them, [courts] determine 'not whether they support an exception to the general duty of reasonable care on the facts of the particular case . . . , but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy.'" *Id.* at 726–27 (quoting *Regents v. Superior Ct.*, 413 P.3d 656, 670 (Cal. 2018)).

Considering the question of foreseeability, the issue was, not whether a particular plaintiff's injury was foreseeable in light of a particular defendant's conduct, but whether "the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed." *Id.* at 727. Case-specific factors, on the other hand, may be relevant to "determining the applicable standard of care or breach in a particular case." *Id.*

In *Brown*, the plaintiffs alleged specific prior instances of sexual abuse of youth athletes who were members of USA Taekwondo by coaches and numerous complaints to USA Taekwondo

by parents and athletes, putting USA Taekwondo on notice of the problem. They also alleged that sexual abuse of young athletes by credentialed coaches generally was "so rampant by 1999 defendant USOC required all [national governing bodies] to have specific insurance to cover coach sexual abuse," and they alleged that, by 2007, "sexual abuse of minors by figures of authorit[y], like priests, coaches, and scout leaders was a widely known risk in American society." *Id.* at 728. Based on all of these allegations, the court found it foreseeable that youth athletes attending Olympic qualifying competitions with their coaches might be sexually molested by their coaches, regardless of whether USA Taekwondo was specifically on notice of prior misconduct by Gitelman. It was also foreseeable that coaches with the opportunity to be alone with youth athletes would sexually abuse them during road trips and overnight stays. *Id.*

Regarding "the closeness of the connection between the defendant's conduct and the injury suffered," the court found this factor, too, related to foreseeability—the foreseeability that the particular negligence at issue would lead to the injuries alleged. The court found it relevant for purposes of weighing this factor that the plaintiffs alleged that USA Taekwondo was negligent in failing to adopt and enforce policies and procedures to protect athletes from sexual abuse by coaches—in particular that it was aware by 1992 that taekwondo coaches were abusing athletes but did not adopt policies to prevent such abuse until late in 2013, after Gitelman had abused the plaintiffs—and that the failure to adopt policies and procedures was "closely connected to the injury that the plaintiffs suffered because action by [USA Taekwondo] could have reduced the risk of the plaintiffs being abused by limiting inappropriate conduct between coaches and youth athletes." *Id.* at 729.

Weighing the policy factors, the court attributed some moral blame to USA Taekwondo, because of its failure to implement policies to prevent sexual abuse of youth athletes by coaches

until 2013, noting that moral blame may attach when the defendant could have taken, but failed to take, reasonable steps to avert foreseeable harm. *Id.* ta 729–30. The court also found that the "societal goal of safeguarding youth athletes from sexual abuse" weighed heavily in favor of imposing a duty on USA Taekwondo to implement and enforce policies and procedures to protect athletes, that it was in the best position to take measures to prevent future harm, and that imposing this duty on it would not be unduly burdensome or costly in light of the benefits to society. *Id.* at 731. Finally, the court noted that the factor relating to the availability and cost of insurance weighed in favor of imposing a duty, in light of the allegation that USA Taekwondo had obtained insurance to cover sexual abuse by coaches in 1999. *Id.*

Based on all of these factors, the court found that application of the *Rowland* factors to the facts as alleged by the plaintiffs supported the imposition of a duty of care on USA Taekwondo to "use reasonable care to protect taekwondo youth athletes from foreseeable sexual abuse by their coaches." *Id.* at 731. Although Tennessee's framework for analyzing duty in the context of a special relationship is perhaps not as comprehensive as California's, and the facts alleged in *Brown* were substantially more egregious than those at issue here, *Brown* is nonetheless instructive.

<i>c)</i>     <i>Whether USA Fencing Owed a Duty to Jane Doe</i>

In seeking dismissal of the negligence and negligent supervision claims, USA Fencing asserts that the plaintiffs' allegation that it "failed to implement and enforce policies and procedures that would prevent coaches from having 1:1 unsupervised contact or communications" with minor athletes is "inconsistent with and contradicts the allegations" in the FAC, because, according to USA Fencing, there is "no doubt" that it took measures to minimize the risk of sexual abuse of minor athletes. (Doc. No. 44, at 16.) USA Fencing construes the FAC as acknowledging that USA Fencing "undertook extensive measures to prevent sexual abuse of minor fencers, consistent with [USOC] and SafeSport mandates," including requirements that coaches undergo

background screening, as well as training on the prevention of athlete abuse, and that member coaches and clubs comply with the "U.S. Center Safe Sport Code and the USA Fencing Code of Conduct." (Doc. No. 44, at 20.) In support of these assertions, USA Fencing cites its own website and that of SafeSport rather than the FAC itself. (*See, e.g.*, *id.* at 20 nn. 8–11.)

In the FAC, the plaintiffs indeed allege that USA Fencing adopted its own policies and procedures and that it represents to parents and young fencers that it is committed to "creating a safe and positive environment for athletes' physical, emotional and social development" and an "environment free of misconduct," and that Piraino was subject to its various policies and procedures. (Doc. No. 36 ¶¶ 35, 55.) However, they further allege that, although USA Fencing had the power and authority to control, monitor, and supervise Piraino, to discipline him and to strip him from any position held within the organization, it failed to "take reasonable measures to prevent a person in [Piraino's] position" from engaging in sexual misconduct or "to detect such conduct when it occurred." (*Id.* ¶¶ 58, 69.) Specifically, USA Fencing allegedly created a system "where the only person tasked with ensuring that Piraino and the other coaches at MCFC" followed the policies implemented by USA Fencing was Piraino himself. (*Id.* ¶ 71.) The plaintiffs allege that USA Fencing "did not have an audit process or other mechanisms in place to detect when repeated and pervasive violations of applicable laws and policies relating to sexual misconduct were occurring" and, "[p]erhaps most critically," "failed to provide young fencers and their parents with information and training concerning MAAPP, the SafeSport Code, or USA Fencing's fencing-specific policies and procedures relating to the preventing and detection of sexual abuse." (*Id.* ¶¶ 71–72.)

USA Fencing does not actually address the question of whether a special relationship existed, either between it and Jane Doe or between it and Piraino. The court finds that the facts as

alleged are sufficient to establish the existence of a special relationship between USA Fencing and Piraino. As the Tennessee Court of Appeals found in 2014, "[t]he plethora of litigation, both civil and criminal, arising from alleged sexual abuse of children by persons in authority, in addition to the attention provided to this social evil by the media and throughout every strata of society, renders the alleged abuse in this case entirely foreseeable." *Ms. B.* v, 2014 WL 890892, at *5. Here, as there, the gravity of the foreseeable harm is enormous, and the prevention of child sexual abuse is a "priority in Tennessee." *Id.* And, much like USA Taekwondo in *Brown*, fencing athletes in the United States must be members of USA Fencing and train under USA Fencing certified trainers in order to compete in USA Fencing-sanctioned tournaments or participate in other USA Fencing-sponsored events. (Doc. No. 36 ¶ 16.) Piraino was a USA Fencing member coach, authorized by USA Fencing to supervise and instruct athletes at USA Fencing-approved clubs and at USA Fencing-sanctioned events. (*Id.* ¶ 38.) The plaintiffs allege that USA Fencing had some measure of control over Piraino through its policies and procedures, and, as the national governing body of fencing, USA Fencing is responsible for the conduct and administration of fencing in the United States and for "creating a common set of rules and policies that govern members and clubs when participating in fencing-related activities." (*See id.* ¶ 15.) In addition to being governed by SafeSport, USA Fencing undertook to adopt its own policies and procedures relating to the prevention of sexual abuse, and it represents to the fencing community that it is committed to creating a "safe and positive environment" for young fencers. (*Id.* ¶¶ 34–35.) It retained "wide discretion and authority to implement its own abuse-prevention measures." (*Id.* ¶ 36.)

In *Ms. B.*, the question of whether a national organization should incur a duty to "take reasonable measures to prevent sexual abuse" of the children participating in its programs turned on whether the national organization had the "means and ability to control" its local affiliates'

actions. *Id.* at *6. In the present case, the plaintiffs allege that, although USA Fencing had implemented certain policies related to the prevention of child sexual abuse, it failed to implement reasonable policies relating to the detection of child abuse or to informing children and parents about how to recognize and respond to abuse when it occurred, and failed to enforce the provisions it did have in place. They also allege that USA Fencing had the means and ability to supervise and monitor Piraino. While USA Fencing denies that it had the ability or means to oversee Piraino's day-to-day activities, the plaintiffs have adequately alleged that it did have the means. Like USA Taekwondo in *Brown*, USA Fencing was "in a unique position to protect young athletes from the risk of sexual abuse by their coaches," *Brown II*, 253 Cal. Rptr. 3d at 726.

The court finds, in short, that a special relationship existed between USA Fencing and its member organizations and coaches, and further finds that the foreseeability of the sexual abuse of young athletes gave rise to a duty to Jane Doe on the part of USA Fencing. To be sure, the allegations in this case are dissimilar from those in either *Brown* or *Ms. B.*, insofar as the plaintiffs here acknowledge that USA Fencing had, in fact, put in place at least some of the policies required by federal law and SafeSport. And they do not allege that Piraino openly engaged in sexual misconduct with Jane Doe such that his relationship with her was an open secret, as was the situation in *Brown*. Most of the abuse took place digitally and was designed to evade detection. However, the question of whether USA Fencing actually *breached* a duty is one not raised by USA Fencing's Motion to Dismiss and, even if it had been, that is not the type of question that can typically be resolved by a motion to dismiss.

USA Fencing does not substantively support its claim that the plaintiffs fail to adequately allege proximate causation and has not shown that dismissal on this ground is warranted. The plaintiffs, for purposes of a Rule 12(b)(6) motion, adequately allege that, but for the defendant's

negligence, Piraino would not have been in a position to abuse Jane Doe or, at a minimum, that the abuse would have been detected sooner. The negligence claims against USA Fencing in the FAC are adequately pleaded under *Iqbal* and Rule 8.

       5.     *Negligence Per Se*

As set forth above, an ordinary negligence claim under Tennessee law requires the plaintiff to establish that the defendant's conduct fell below the "familiar 'reasonable person under similar circumstances' standard." *Rains v. Bend of the River*, 124 S.W.3d 580, 588 (Tenn. Ct. App. 2003) (citations omitted). "Negligence *per se*" is described by Tennessee courts as a doctrine that "enables the courts to mold standards of conduct in penal statutes into rules of civil liability." *Id.* at 589. The doctrine "does not create a new cause of action. Rather, it is a form of ordinary negligence that enables the courts to use a penal statute to define a reasonably prudent person's standard of care." *Id.* (internal citations omitted). In other words, "[n]egligence *per se* arises when a legislative body pronounces in a penal statute what the conduct of a reasonable person must be, whether or not the common law would require similar conduct." *Id.* (citation omitted). Under this doctrine, the statute provides the applicable standard of care, thus rendering certain conduct negligent as a matter of law. *Id.* at 590. The plaintiff must still prove breach of that standard and damages. *Id.*

Moreover, not every statutory violation amounts to negligence *per se*. "To trigger the doctrine, the statute must establish a specific standard of conduct." *Id.* The decision whether a statute may trigger a negligence *per se* claim is within the courts' discretion. The Tennessee Supreme Court has explained that, "[w]hen a statute provides that under certain circumstances *particular acts shall or shall not be done*, it may be interpreted as fixing a standard of care . . . from which it is negligence to deviate." *Est. of French v. Stratford House*, 333 S.W.3d 546, 560–61 (Tenn. 2011) (emphasis added) (quoting *Cook ex rel. Uithoven v. Spinnaker's of Rivergate,*

*Inc.*, 878 S.W.2d 934, 937 (Tenn. 1994)). In addition, the plaintiff must show that he "belongs to the class of persons the statute was designed to protect" and that his "injury is of the type that the statute was designed to prevent." *Rains*, 124 S.W.3d at 591. The doctrine may be applied based on a violation of federal and state regulations or ordinances, as well as statutes. *See Est. of French*, 333 S.W.3d at 561, 562.

The plaintiffs assert that, beginning in January 2019, USA Fencing was required by federal law to "implement reasonable procedures to limit one-on-one interactions between an amateur athlete who is a minor and an adult (who is not the minor's legal guardian) at a facility under the jurisdiction of a national governing body or paralympic sports organization without being in an observable and interruptible distance from another adult, except under emergency circumstances," and to "offer and give consistent training related to the prevention of child abuse to: (1) adult members who are in regular contact with amateur athletes who are minors and (2) subject to parental consent, to members who are minors." (Doc. No. 36 ¶¶ 165, 166.) In support of this assertion, they cite 36 U.S.C. §§ 220524 and 220541(b). (*Id.*)[16] They also allege that "Jane Doe is within the category of persons meant to be protected by this law, and a violation of this law that causes harm to Jane Doe is therefore negligence *per se*." (*Id.*)

Similarly, the plaintiffs allege that MCFC was required by federal law to comply with 36 U.S.C. § 220530(a)(2) and (3), that Jane Doe is within the category of persons meant to be protected by these provisions, and that violation of them causing her harm constitutes negligence *per se*. (Doc. No. 36 ¶¶ 185, 186.)

---

[16] The plaintiffs also cite, in a footnote, U.S. Center for SafeSport, "Minor Athlete Abuse Prevention Policies," p. 3 (January 23, 2019). It appears that this is the document actually quoted in the FAC, rather than the cited statutes.

Section 220524, titled "General duties of national governing bodies," provides that a national governing body—including USA Fencing—shall, for the sport that it governs, "promote a safe environment in sports that is free from abuse of any amateur athlete, including emotional, physical, and sexual abuse." 36 U.S.C. § 220524(13).[17] While this statute imposes a general goal of promoting a safe environment, it does not prescribe or proscribe "particular acts [that] shall or shall not be done," so as to "fix" a particular standard of care. That is, it does not enumerate specific steps the governing body must take in order to promote a safe environment. Because the statute does not actually provide a standard of care, it does not support a negligence *per se* claim.

Section 220541 designates the United States Center for SafeSport to serve as the "independent national safe sport organization and be recognized worldwide as the independent national safe sport organization for the United States." *Id.* § 220541(a)(1)(A). It authorizes SafeSport to, among other things, "maintain an office for education and outreach that shall develop training, oversight practices, policies, and procedures to prevent the abuse, including emotional, physical, and sexual abuse, of amateur athletes participating in amateur athletic activities through national governing bodies." 36 U.S.C.A. § 220541(a)(1)(C). Further, "[t]he policies and procedures developed under subsection (a)(1)(C) shall apply as though they were incorporated in and made a part of section 220524 of this title." *Id.* § 220541(b).

The plaintiffs allege that, in light of this authorization, SafeSport adopted "its Minor Athlete Abuse Prevention Policies ('MAAPP')" which establish "training requirements relating to the prevention of child abuse for members participating in Olympic sport, and prevention policies focused on limiting one-on-one interactions between adults and minors." (Doc. No. 36 ¶ 33.)

---

[17] Section 220524 prescribes a number of other functions national governing bodies are to perform, but none of the others appears relevant here.

Beyond this, however, the plaintiffs have not identified specific MAAPP policies pertaining to specific actions that USA Training was required, but failed, to implement. Moreover, it is unclear that SafeSport's policies and procedures, which do not appear to have been formally adopted as regulations, could serve as a basis for a negligence *per se* claim.

In short, while the creation of SafeSport and its implementation of the MAAPP serve to support the conclusion that USA Fencing incurred a duty vis-à-vis Jane Doe and her parents to protect Jane Doe from sexual abuse perpetrated by her coach, the FAC does not establish the existence of a statute, regulation, or ordinance that sets forth "particular acts [that] shall or shall not be done," so as to "fix" a particular standard of care, for purposes of stating a negligence *per se* claim against USA Fencing.

The negligence *per se* claim against MCFC is premised upon statutory provisions that require "amateur sports organizations" such as MCFC to:

> establish reasonable procedures to limit one-on-one interactions, including communications, between an amateur athlete who is a minor and an adult (who is not the minor's legal guardian) at a facility under the jurisdiction of the applicable amateur sports organization without being in an observable and interruptible distance from another adult, except under emergency circumstances;
>
> [and] offer and provide consistent training to all adult members who are in regular contact with amateur athletes who are minors, and subject to parental consent, to members who are minors, regarding prevention and reporting of child abuse to allow a complainant to report easily an incident of child abuse to appropriate persons[.]

36 U.S.C.A. § 220530(a)(2)–(3). Again, these provisions are arguably relevant to the creation of a duty on the party of MCFC, but they do not "establish a specific standard of conduct," aside from "reasonableness" in the creation of procedures to prevent child sexual abuse. *Rains*, 124 S.W.3d at 189. But "[i]nvoking the negligence *per se* doctrine is unnecessary and redundant if the statute requires only the ordinary reasonable person standard of conduct." *Id.* at 590.

The court finds that the FAC fails to state a negligence *per se* claim against either USA Fencing or MCFC for which relief may be granted. This is not to say, however, that the MAAPP standards and statutes to which the plaintiffs refer may not ultimately be relevant to establish the applicable standard of care. They simply are not sufficient, standing alone, to create a standard of care for purposes of stating a negligence *per se* claim.

### C.    Conclusion: Motions to Dismiss

For the reasons set forth herein, USA Fencing's Motion to Dismiss will be granted, insofar as it seeks dismissal of the claims against it under 18 U.S.C. § 1595(a) and for negligence *per se*, and denied with respect to the negligence claims.

MCFC's motion will be granted as to the negligence *per se* claim but denied in all other respects. An appropriate Order is filed herewith.

## III.    MOTIONS TO STRIKE

### A.    Legal Standard

Motions to strike are governed by Rule 12(f) of the Federal Rules of Civil Procedure, which specifically contemplates striking "redundant, immaterial, impertinent, or scandalous matter" from *pleadings*. Fed. R. Civ. P. 12(f); *see also Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006) (affirming the district court's denial of a motion to strike exhibits attached to a dispositive motion, as these documents did not fall within the scope of Rule 12(f)).

Motions to strike are viewed with disfavor and are not frequently granted. *Operating Eng'rs Local 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015) (citing *Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir. 1977); *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)). They are disfavored because they are, more often than not, simply "time wasters" that tie up the court and the parties in "purely cosmetic" matters. *Neal v. City of Detroit*, No. 17-13170, 2018 WL 1399252, at \*1 (E.D. Mich. Mar. 19,

2018) (quoting Wright & Miller, 5C Federal Practice & Procedure § 1382 (3d ed. 2004)). While trial courts have inherent power to control their dockets and may exercise their discretion to strike documents or portions of documents, *Aerel S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006), they also have the discretion to simply disregard irrelevant, inadmissible, unsupported, or redundant material. *Accord, e.g.*, *Berry v. Frank's Auto Body Carstar, Inc.*, 817 F. Supp. 2d 1037, 1041–42 (S.D. Ohio 2011) ("[M]otions to strike are disfavored; a Court should ignore inadmissible evidence instead of striking it from the record." (footnote omitted)), *aff'd*, 495 F. App'x 623 (6th Cir. 2012).

Generally, a motion to strike should be granted only when "the allegations being challenged are so unrelated to plaintiff's claims as to be unworthy of any consideration as a defense and . . . their presence in the pleading throughout the proceeding will be prejudicial to the moving party." *Hobbs v. Kroger Ltd. P'ship I*, No. 3:18-CV-01026, 2019 WL 1861330, at \*3 (M.D. Tenn. Apr. 24, 2019) (Crenshaw, C.J.) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1380, at 650 (2nd ed. 1990)).

### B.     Piraino and MCFC's Motion to Strike

Piraino and MCFC (collectively "MCFC") move to strike paragraphs 22 through 27, 61, 65, and 66 of the FAC as "immaterial, impertinent, and/or scandalous matter." (Doc. No. 41, at 2.) The first set of these paragraphs concerns non-parties: a fencing coach suspended by USA Fencing in 2014 after allegations of a sexual relationship with a fencer when she was a minor; sexual assault allegations against an Olympic fencer in 2013 and 2014; comments by USA Fencing's Chairman in 2021 relating to the number of fencing coaches arrested for sexually assaulting a minor that year; a blog reporting a very unofficial survey and resulting estimate of the percentage of women in the fencing community who had been sexually assaulted; the resignation of USA Fencing's (female) CEO in September 2021 "amid mounting pressure over the mishandling of complaints

relating to sexual abuse"; and other well known scandals involving sexual misconduct in nationally known organizations. (Doc. No. 36 ¶¶ 22–27.) The second set of allegations concerns Piraino: his allegedly belligerent and unethical conduct at fencing tournaments; drinking to excess and providing alcohol to underage fencers at social events; and his arrest for public intoxication in 2015. (*Id.* ¶¶ 61, 65–66.)[18]

The court finds the allegations regarding sexual misconduct involving non-entities in paragraphs 22 through 27 to be generally relevant to the question of whether the abuse at issue in this case was foreseeable. Although it is somewhat cumulative, it is not actually redundant or scandalous. Although MCFC argues that this material is not well known to the average citizen from Middle Tennessee, it cannot show that it is actually prejudiced by the allegations. The court notes that the results of the highly unscientific survey on the "Fencing Coach" blog in paragraph 25 are unsupported and likely inadmissible, but the court will simply exercise its discretion to disregard that paragraph.

Similarly, paragraphs 61 and 65 are at least potentially relevant and no more scandalous than the allegations concerning Piraino's sexual misconduct. The court will deny the motion to strike these paragraphs. Paragraph 66, however, concerning Piraino's alleged 2015 arrest for public intoxication, is completely immaterial, and whatever probative value it might have would be "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The presence of this allegation in the pleading is likely to prejudice the defendants. *Hobbs*, 2019 WL 1861330, at *3. The court will strike paragraph 66 of the FAC.

---

[18] The irony of moving to strike these allegations, of course, is that it brings them to the court's, and potentially the public's attention.

**C.      USA Fencing's Motion to Strike**

USA Fencing asks the court to strike many of the same paragraphs of the FAC to which MCFC objects (paragraphs 22, 23, 25–27, 61). (*See* Doc. No. 43-1.) The motion will be denied, insofar as it is directed to those paragraphs, for the reasons set forth above.

In addition, it seeks to strike numerous additional paragraphs (17, 39, 53, 56, 59, 83, 85, 86, 87, 88, 89, 166–73, 176, and 179) of the FAC. Regarding these paragraphs, USA Fencing contends that the following categories of information are irrelevant or unduly prejudicial and should be stricken: (1) allegations regarding USA Fencing's annual revenues and the availability of insurance; (2) references to awards issued to MCFC or Piraino after Jane Doe joined MCFC; (3) references to Piraino's being USA Fencing's agent; (4) references to a duty owed to John Doe and Judy Doe, for purposes of the plaintiffs' negligence claim;[19] (5) references to a 2022 USA Fencing survey; (6) references to a December 2022 USOC Audit Letter raising concerns about USA Fencing's process for handling complaints; (7) references to USA Fencing management changes and Board of Director meetings subsequent to Piraino's arrest; and (8) allegations about USA Fencing's complaint process or the plaintiffs' reporting of Piraino to law enforcement. The plaintiffs respond that USA Fencing cannot show that it is prejudiced by any of the challenged material and that the material is relevant and not scandalous or impertinent.

Many of USA Fencing's objections are based on their contention that the allegations amount to legal conclusions or are unsupportable. (*See, e.g.*, Doc. No. 43, at 11 (disputing whether Piraino acted as USA Fencing's agent); *id.* at 12 (disputing whether John Doe and Judy Doe can

---

[19] The court notes that USA Fencing did not actually move to dismiss the parents' negligence claim except on statute of limitations grounds and on the basis that the parents seek damages to which they are not entitled. To the extent USA Fencing is seeking to use its Motion to Strike as a substitute for a motion to dismiss, the court rejects the attempt.

establish that USA Fencing owed them a duty for purposes of a negligence claim).) That is not a valid basis for striking material from a pleading.

The remaining challenged material is at least tangentially relevant, and none of it is scandalous or impertinent to the degree contemplated by Rule 12(f). Moreover, USA Fencing has not shown that the challenged allegations are actually prejudicial. Regarding USA Fencing's annual revenues, as the plaintiffs point out, the information is public, posted on USA Fencing's website. Regarding insurance, the plaintiffs posit that this information is not made for the purpose of showing that USA Fencing is insured, but because USA Fencing represents to the public on its website that its coaches are insured. Likewise USA Fencing published the results of a 2022 survey of its membership as well as the results of the audit conducted by the USOC and cannot claim to be prejudiced by allegations regarding these documents.

The court finds no basis for striking any of the material to which USA Fencing objects.

IV. **CONCLUSION**

For the reasons set forth herein, the court will grant in part and deny in part the Motions to Dismiss. (Doc. Nos. 41, 44-1.)

USA Fencing's Motion to Strike (Doc. No. 43-1) will be denied in its entirety, and Piraino and MCFC's Motion to Strike (Doc. No. 41) will be denied, *except* insofar as it seeks to strike reference to Piraino's 2015 arrest for public intoxication (Doc. No. 36 ¶ 66). An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge