# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JANE DOE, a minor, by her parents and next friends JOHN DOE and JUDY DOE, JOHN DOE, in his individual capacity and JUDY DOE, in her individual capacity, | ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No. 3:22-cv-00560 |
| v. | ) ) | Judge Aleta A. Trauger |
| ROBERT PIRAINO, MUSIC CITY FENCING CLUB, INC., and UNITED STATES FENCING ASSOCIATION, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment or in the Alternative Partial Summary Judgment as to the Punitive Damages Claims (Doc. No. 144), filed by defendant United States Fencing Association ("USA Fencing" or "USAF"). For the reasons set forth herein, the motion will be granted.

## I.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

In moving for or responding to a motion for summary judgment, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S.

at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

## II.    PROCEDURAL HISTORY

Plaintiffs Jane Doe, a minor at the time this lawsuit was filed, and her parents John Doe and Judy Doe (the "parents") initiated this action on July 27, 2022 against Music City Fencing Club, Inc. ("Music City Fencing"), Robert Piraino, and USAF. (Doc. No. 1.) The Second Amended Complaint ("SAC"), now the operative pleading, alleges that Robert Piraino engaged in sexually inappropriate communications with Jane Doe between 2019 and 2021 in Nashville, Tennessee, while he was Jane Doe's fencing coach and the owner, principal, and head coach of Music City Fencing. (Doc. No. 115 ¶¶ 5, 89–134.) On November 16, 2022, Piraino pleaded guilty to multiple counts relating to the sexual abuse of Jane Doe and another child, including (1) two counts of especially aggravated exploitation of a minor and (2) one count of sexual exploitation of a minor via electronic means. (*Id.* ¶ 133.) He was sentenced to 25 years in prison without parole. (*Id.*)

The SAC asserts a claim against USAF for negligence and negligent supervision of Piraino that allegedly resulted in his inappropriate conduct with Jane Doe. USAF seeks summary judgment on this claim, asserting that the undisputed facts establish that it did not breach any duty of care it may have owed Jane Doe. Its motion is accompanied by a Memorandum of Law, Statement of Undisputed Material Facts ("SUMF"), and the evidence it cites in support of its SUMF. (Doc. Nos. 144-1, 145, 150-1 through -20 and attached exhibits.) The plaintiffs have filed a Response in opposition to the motion, Response to the SUMF, and their own evidentiary material. (Doc. Nos. 155, 155-1 through -17, 156.) The defendant has filed a Reply. (Doc. No. 161.)

### III.    UNDISPUTED FACTS[1]

On November 8, 1978, the Amateur Sports Act (renamed the Ted Stevens Olympic and Amateur Sports Act), was signed into law. The Act brought about significant changes in Olympic sport governance and the advent of National Governing Bodies (NGBs) as organizations that govern and manage all aspects of particular sports within the United States. *See* https://www.usopc.org/ngb-resources (last accessed November 24, 2025). The United States Olympic & Paralympic Committee (USOPC), per the Ted Stevens Act, was designated as the coordinating body for all Olympic related athletic activities, including the recognition of NGBs. The USOPC delineates the requirements for NGB membership. Modern-day NGBs have extensive responsibilities related to corporate governance, adoption and enforcement of codes of conduct and ethics, policies and procedures, managing sporting competitions, certification and discipline of coaches, implementation of child-safety measures and, otherwise complying with the Ted Stevens Act.

USA Fencing is a 501(c)(3) not-for-profit Colorado corporation. (Doc. No. 150-8, Andrews Rule 30(b)(6) Dep. 10.)[2] It was founded in 1891 as the Amateur Fencers League of America (AFLA) by a group of New York fencers seeking independence from the Amateur Athletic Union. USA Fencing was recognized as the National Governing Body (NGB) for the sport in 1981, at which time it changed its name from AFLA to United States Fencing Association (now known as USA Fencing). USA Fencing is responsible for, among other things, promoting the sport of fencing in the United States, determining the standards by which athletes will be chosen to represent the

---

[1] The facts for which no citation is provided are drawn from the plaintiffs' Response to the defendant's SUMF and are undisputed for purposes of summary judgment.

[2] The transcript of this deposition in the record is in condensed form, with four pages per standard page. The court refers to it by its original pagination.

United States in international competition, maintaining a national membership system for students, coaches, referees, and other members of the fencing community, and creating a common set of rules and policies that govern members and clubs when participating in fencing related activities.

USA Fencing is divided into six regions: Region 1: Northwest; Region 2: Midwest; Region 3: Northeast; Region 4: Southwest; Region 5: South; and Region 6: Southeast. Each region has a Regional Coordinator, a two-year position for which candidates are selected by USA Fencing through a competitive application process. (SAC ¶ 47.)[3] Each Regional Coordinator's "[p]rimary role is to oversee the regional tournaments in that [region]." (Andrews Rule 30(b)(6) Dep. 60.) The Regional Coordinator should generally "understand[] the needs of fencing in that region," "serv[e] as the liaison between the regional events team . . . at USA Fencing headquarters and the region[']s membership parents and club owners," and "ensur[e] information is disseminated regarding "regional tournament requirements." (*Id.* at 60–61.)

Each region is comprised of numerous divisions, which often geographically correspond to state boundaries. A division is the primary governing body for the local fencing community. Divisions, which are also staffed by volunteers elected by local members, sanction fencing tournaments, create specific regulations for that fencing community, and run divisional qualifying events. Divisions utilize Uniform Bylaws adopted by USA Fencing and, per the Bylaws, function under a Division Operating Guide.

USA Fencing has always offered multiple tiers of membership, generally divided into those for an Individual and those for a Club. There are currently three membership tiers: access,

---

[3] Many of the undisputed statements set forth in USA Fencing's SUMF cite specific paragraphs within "Dkt. 51" as the evidentiary support for the statements. (*See, e.g.*, Doc. No. 145 ¶¶ 1–14, 17, 20–21, *etc.*) The court presumes, and the plaintiffs also apparently understood, that the defendant intended to refer to the SAC. (Doc. No. 115.)

competitive, and coach memberships. Membership in USA Fencing is necessary for all athletes to participate in USA Fencing-sanctioned regional, national or international competitions, as well as to be a fencing coach.

At all relevant times, coach members were required to complete background screening and were automatically denied membership with USA Fencing if any prior offense was identified. USA Fencing also employed a SafeSport coordinator specifically charged with overseeing compliance with background screenings and trainings.

Since 2017, the national "SafeSport program" has been formulated and administered by the U.S. Center for SafeSport, per federal mandate. On March 3, 2017, the SafeSport Code became applicable to all NGBs. However, according to Philip Andrews, Chief Executive Officer of USA Fencing, USAF, like most NGBs, needed to amend its bylaws to acknowledge and accept the jurisdictional authority of the U.S. Center for SafeSport in order to be able to refer cases to it. This occurred effective August 1, 2017. (Andrews Rule 30(b)(6) Dep. 10–12.) USA Fencing had also put in place its own "SafeSport policy" in 2013. (*Id.* at 13.)

The plaintiffs dispute that USA Fencing accepted the jurisdictional authority of the U.S. Center for SafeSport on August 1, 2017 on the basis that USA Fencing provided no documentation to support Andrews' testimony, other than a 2024 email from a U.S. Center for SafeSport employee. (*See* Doc. No. 155-3 at 37.) This August 7, 2024 email from Jocelyn Shafer, Director of Intake and Resolutions for U.S. Center for SafeSport, to Christina Pachuta, Director of Member Safety and Compliance for USA Fencing, states in relevant part:

> Hi Christina,
>
> I was able to track down the information you are looking for. I don't have formal documentation; however, I can confirm USA Fencing's jurisdictional date was July 31, 2017. That would be the date where USA Fencing was required to submit reports to the Center.

As far as rollout plan, I don't have any documentation within that realm.

(*Id.*) The plaintiffs argue that this email "could not be presented in admissible form"—even though they are the party that introduced it into evidence for purposes of opposing USA Fencing's motion—and that it is "contradicted by the SafeSport Code itself, which USA Fencing has admitted was effective March 3, 2017, and by the statements of USA Fencing's CEO at the time. (Doc. No. 156 ¶ 23 Response (citing Feb. 12, 2025 Ekeren Dep. 209–14 & Exs. 9, 14, Doc. No. 155-2 at 45–50, 61–125).)[4] The SafeSport Code to which the plaintiffs refer states that it is "Effective as of March 3, 2017." (Doc. No. 155-2 at 85.) However, Kris Ekeren, former CEO of USA Fencing, also confirmed that, although the U.S. Center for SafeSport's "code superseded and replaced the USA Fencing SafeSport policy" effective March 3, 2017, USA Fencing "could not submit reports" of abuse to the U.S. Center for SafeSport until August 1, 2017. (Doc. No. 155-2 at 47.) She also testified that the statement contained in Appendix A to the minutes from the Special Meeting of the USA Fencing Board of Directors dated August 31, 2021, to which she was referred during her deposition, was incorrect only in that "there should have been a clarifying comment . . . that we could submit cases effective August 1st" of 2017. (*Id.*; *see also id.* ("I think the report does not include the fact that we could not submit reports until August 1st. And that was clearly an error."); *id.* at 49–50 ("Again, . . . [t]he report should have clarified that we were not able to submit reports [of abuse to SafeSport] until August 1st. . . . I could have done a better job in spelling that out.").) Appendix A corroborates Ekeren's recollection insofar as it states that, although the SafeSport Code was "superseded and replaced the USA Fencing SafeSport Policy" effective

---

[4] The plaintiffs filed excerpts of this deposition. The court will refer to the CM/ECF pagination to facilitate location of the cited portions.

March 3, 2017, "USA Fencing's Code [was] amended and restated in July 2017 to include supplemental SafeSport related policies, procedures and requirements." (Doc. No. 155-2 at 61.)

Under the SafeSport Authorization Act, the federal SafeSport program incorporates "policies[] and procedures to prevent the abuse, including emotional, physical, and sexual abuse, of amateur athletes participating in amateur athletic activities through national governing bodies." 36 U.S.C. § 220541(a)(1)(C). Pursuant to this grant of authority, the U.S. Center for SafeSport adopted in January 2019, and has subsequently amended,[5] its Minor Athlete Abuse Prevention Policies ("2019 MAAPP"), available at https://uscenterforsafesport.org/wp-content/uploads/2019/07/Minor-Athlete-Abuse-Prevention-Policies.pdf (last visited Nov. 22, 2025).[6] The 2019 MAAPP set forth training requirements relating to the prevention of child abuse for members participating in Olympic sport and prevention policies focused on limiting one-on-one interactions between adults and minors. The stated purpose of MAAPP is to "assist [NGBs] in meeting their obligations under federal law." 2019 MAAPP at 3.[7]

The SafeSport program covers all individuals who participate in sport within the Olympic and Paralympic Movements; all USA Fencing coach-members are required to comply with both USA Fencing and SafeSport rules. Further, all adult participants who interact with minor athletes, including coach-members, are required to receive SafeSport/FenceSafe/MAAPP training. USA Fencing also makes SafeSport programming available to minor athletes and their parents, as required by federal law and USA Fencing. This training for minor athletes and their parents is not

---

[5] *See* https://maapp.uscenterforsafesport.org/ (last visited Nov. 22, 2025).

[6] An undated version of this document, which is not identical to the one cited by the SAC or available online, was filed with USA Fencing's Motion for Summary Judgment. (Doc. No. 150-19.)

[7] This language is missing from the version of the 2019 MAAPP filed by USA Fencing.

mandatory, but USA Fencing strongly encourages parents and athletes to take advantage of these free training sessions.

MAAPP includes a policy that all one-on-one in-program interactions between an adult participant and a minor athlete must be "observable and interruptible." 2019 MAAPP at 3. Additionally, as set forth beginning with the 2020 MAAPP, all electronic communications between an adult participant and a minor athlete are required to be "open and transparent," which includes copying/including the minor athlete's parent; with limited exceptions, all communications between an adult participant and a minor athlete must include the minor's parent. (Doc. No. 150-20, 2020 MAAPP 14–15.) Only platforms that allow for open and transparent communication may be used to communicate. Violation of USA Fencing and U.S. Center for SafeSport policies can subject a member to sanctions, including banishment from the sport.

Defendant Music City Fencing Club, owned and operated by defendant Robert Piraino, was formed as a USA Fencing member club in 2014 and incorporated in Tennessee as Music City Fencing Club, Inc. in September 2017. Music City Fencing, located in Nashville, Tennessee, occupied approximately 3,000 square feet of open floor space, with a single column in the middle, with a lounge area for parents to observe their children, separate bathrooms and locker rooms, and a small armory for repairing equipment. Piraino was the sole owner, officer, and director of Music City Fencing. As such, he was responsible for the management of Music City Fencing and made all decisions relating to finances, personnel, leases, equipment acquisitions, and policies and procedures governing the company's day-to-day operations, including the adoption, implementation, and enforcement of the company's policies and procedures relating to the prevention and detection of sexual abuse. Piraino had complete control over the operations and management of Music City Fencing.

Consistent with U.S. Center for SafeSport requirements, USA Fencing mandates that all of its member-coaches attend child abuse prevention training. In addition, all USA Fencing coaches were required to undergo a criminal background check and were automatically denied membership with USA Fencing if any prior offense was identified. It is undisputed that Piraino was required to complete SafeSport training every year beginning in 2018. The record contains certificates reflecting his completion of SafeSport training in 2018, 2019, 2020, and 2021 and showing that he underwent background screenings in 2018, 2020 and 2021, which did not identify any criminal convictions. (Doc. No. 150-15 at 2–8.) According to Philip Andrews, even before implementation of SafeSport, Piraino, as a coach-member of USA Fencing, would have undergone background checks as a coach every two years beginning in 2013, with a "supplemental background screen in the interim year." (Andrews Rule 30(b)(6) Dep. 32.) Under the USA Fencing rules in effect at the time, Piraino and other coaches were required to attend "awareness training concerning misconduct every two years," beginning in 2014. (USA Fencing 2013–2014 Athlete Handbook, Doc. No. 150-18 at 149.) The plaintiffs purport to dispute this statement by pointing out that USA Fencing is unable to document Piraino's training or background checks prior to 2018.[8]

Piraino volunteered for the Tennessee Division of USA Fencing and served as the Division Chair (an elected position) continuously from approximately 2014 until he was arrested in August 2021. (Doc. No. 150-17, Piraino Dep. 52.)[9] He was appointed to serve as the Regional Coordinator for Region 6 of USA Fencing beginning in 2020.

---

[8] Andrews explained that documentation of Piraino's background screenings prior to 2018 were maintained by the National Center for Safety Initiatives and that USA Fencing was "aware that [Piraino] has had screenings but [was] unable to pull the record . . . because of the length of time it was away." (Andrews Dep. 33.)

[9] This deposition transcript is in condensed format, so the court employs the original deposition pagination.

Jane Doe joined Music City Fencing in July 2017, shortly after moving to Tennessee with her family. She was eleven years old at the time. (SAC ¶ 90.) Piraino engaged in sexually inappropriate communications with Jane Doe beginning in the Spring/Summer of 2019 and continuing through early 2021, when she ceased communicating with him. (*Id.* ¶¶ 91–122.) Piraino communicated with Jane Doe without her parents' knowledge, including sending her sexually inappropriate photographs and videos of himself and persuading her to send him sexually suggestive photos and videos of herself. These communications took place via Snapchat, a mobile messaging and social media app where users share photos, videos, and text messages. The defining feature of Snapchat is that most content is temporary, disappearing after a short period. There is no dispute that Piraino's behavior was contrary to USA Fencing and SafeSport policy. USA Fencing did not monitor or have access to member-coaches or athletes' electronic communications or devices.

Jane Doe's parents paid for her mobile service, and they had rules about, supervised, and monitored her use of mobile devices. During the pertinent timeframe, Judy Doe, Jane Doe's mother, regularly inspected her daughter's telephone, including apps, and she required that Jane Doe allow her to have access to her social media accounts. Judy Doe never found anything of concern.

Robert Piraino gave Jane Doe a prepaid credit card in exchange for her sending him pictures and videos of herself. (Jane Doe Dep., Doc. No. 150-7 at145.)[10] He reloaded the credit card "multiple times," and Jane Doe used the credit card to purchase clothes. (*Id.* at 146.) Her

---

[10] The transcripts for Jane Doe's and Judy Doe's depositions in the court record do not contain original pagination. The court refers to them by the CM/ECF pagination, which is different from what the original pagination would be, because these depositions were filed with (unnecessary) cover sheets.

parents were not aware that he had given her a credit card. (*Id.* at 147.) However, Judy Doe found a credit card with Piraino's name on it in her washing machine on one occasion while doing her children's laundry. Judy Doe found it "very odd that that man's credit card was in [her] washing machine," and she knew in her "gut" that "something wasn't right," but she did not do anything about this discovery other than ask her children about it. (Judy Doe Dep., Doc. No. 150-13 at 107–08.) Her children denied knowledge of it. (*Id.* at 108.)

USA Fencing and SafeSport rules require that all practices and lessons be open to parents and that coaches interact with minors only in open, observable and interruptible environments. Music City Fencing apparently complied with these rules, and at least one of Jane Doe's parents was present at very lesson or fencing practice Jane Doe attended at Music City Fencing. In addition, there were always other fencers and coaches present during Jane Doe's practice sessions and lessons. At no time did either of Jane Doe's parents observe any inappropriate interactions between Piraino and their daughter or have any concerns about his interactions with their daughter. Piraino never socialized with Jane Doe's family outside of his role as a fencing coach.

Jane Doe alleges that Piraino touched her in "inappropriate areas" on a "few" occasions, all in public while she was training at Music City Fencing. (Doc. No. 150-7 at 139–40.) Specifically, she alleges that Piraino touched her fencing gear-covered breast, thighs, and butt area for the purpose of correcting her fencing posture, always in the presence of her mother and other fencers. (*Id.* at 139–40, 159, 161.) Jane Doe never told her mother that Piraino had touched her inappropriately, and her mother never observed Piraino touch Jane Doe inappropriately. Jane Doe never touched Piraino physically and never had sexual relations with him.

In December 2020, Jane Doe took time off from fencing to rest and rehabilitate an injured shoulder. In early 2021, she texted Piraino to tell him that he was not to have any further

communications with her. In June 2021, Jane Doe began treatment with Courtney Grimes, LCSW, to treat symptoms of anxiety. In July 2021, Jane Doe told Grimes about Piraino's misconduct. Grimes immediately reported the conduct to law enforcement and to Jane Doe's parents, and Piraino was arrested on August 9, 2021.

USA Fencing first learned of Piraino's sexual misconduct with Jane Doe on August 10, 2021, upon receipt of media reports of his arrest. USA Fencing reported Piraino to the U.S. Center for SafeSport on August 10, 2021. The Center accepted jurisdiction of the case and placed Piraino on an interim suspension on August 16, 2021. It banned him from fencing on September 23, 2021.

As noted above, Piraino pleaded guilty to two counts of especially aggravated exploitation of a minor and one count of sexual exploitation of a minor via electronic means on November 16, 2022, and he was sentenced to 25 years in prison without parole.

At no time did any other Music City Fencing coach observe Piraino engage in any sexually inappropriate conduct or communications with Jane Doe or any other minor. The plaintiffs have not identified any USA Fencing member, officer, or director who witnessed or was aware of Piraino's sexual misconduct with Jane Doe or any other minor. USA Fencing had never received prior complaints that Piraino had engaged in sexually misappropriate behavior with minors.

The only prior report USA Fencing had received concerning Piraino was on February 28, 2017, by Katherine Gray (nee Keirstead), an adult who reported that Piraino had touched her inappropriately. Gray testified regarding this incident. Her recollection is that, on February 25, 2017, following a fencing competition, she was wearing her University of Tennessee warmup jacket and standing in a circle talking about the event with some friends. They all "had these jackets on because they were brand-new . . . and [they] were really excited to . . . wear them and show off

. . . [their] team spirit." (Doc. No. 150-11, Gray Dep. 39.)[11] Piraino came up to them and "butted in," and then "reached out and touched [her] breasts and said, hey, nice jacket." (*Id.* at 39–40; *see also id.* at 40 ("He touched my breasts with his hand. I don't remember if it was full breast, full hand, one or two, but his hand was in this area and making physical contact with me.").)

Her contemporaneous written descriptions of the event are not consistent with her testimony about it eight years later. Two days after the incident, on February 27, 2017, Gray sent an email to Piraino that said:

> After Saturday's events concluded, you approached me and, without my consent or even my acknowledging that you were there, reached out to touch my clothing, explicitly in the *area near my breast*. While I recognize that this was not intended to be sexual, it was nevertheless grossly inappropriate. . . . This is a direct violation of USFA SafeSport standards. If I ever see this behavior or something similar repeated, I will not hesitate to report you to USFA.

(*Id.* at 44–45 (emphasis added).) Asked whether this paragraph of her email was true and correct when she wrote it, Gray confirmed that it was a "reflection of what [she] thought the events were at the time" and agreed that her memory of the incident would have been better two days after it than eight years later. (*Id.* at 45.).

On February 28, 2017, she elected to report the incident to USA Fencing. She testified that she elected to report it because, although she did not initially think that Piraino's conduct was intended to be sexual, on further reflection and after talking with her mother (who was a "victim counselor"), she decided that it "needed to be at a minimum flagged in some sort of report in case there was ever another issue with him." (*Id.* at 46–47.) Gray testified that the first version of the report she submitted to USA Fencing did not transmit correctly, and she recalled that she spoke with someone at USA Fencing about the formatting of the document and, in addition, that she was

---

[11] This deposition transcript was filed in condensed format. The court refers to it by its original pagination.

asked to change the categorization of the "abuse" she was reporting from "sexual" to "physical." (*Id.* at 49.) She agreed to do so.

The reformatted and "altered" form was shown to her during her deposition. She used the USAS Fencing Safe Sport Abuse Reporting Form, and the Form reflected that Gray had checked the box for "physical" misconduct. (*Id.* at 54–55.) In addition to providing the details of the victim's identification, the time and location of the event, witnesses, and identification of the individual charged with misconduct, Gray provided the following narrative in the "additional information" section of the form:

> On Saturday (2/25/2017), after the conclusion of the events of the Volunteer Open, I was . . . having a conversation with . . . several other fencers. During the course of this conversation, Robert Piraino approached, and, without my acknowledging or even noticing his presence, reached out to touch my jacket. Specifically, he touched the lapel of my (tight-fitting) jacket in the *area near my breasts*. I immediately took a step away from him and asked what he thought he was doing, stating that he couldn't just touch someone like that. He said that he "only wanted to touch the jacket" and "it wasn't like (he) touched my body or anything." I told him that that didn't matter, that he couldn't just do that and excused myself from the conversation. He did not seem to acknowledge that this conduct was inappropriate. I've been going back and forth on whether or not to file this report, but I believe that no person should ever reach out and touch another's body or their clothing without their permission. I don't know if this falls under SafeSport, or if anything will come of this. I realize that he probably didn't mean the action in a sexual way, but it was nevertheless wrong. I know if he did it to someone else that I would file the report . . . immediately, so I figured that it would be the right thing to do for myself.

(*Id.* at 58–59 (emphasis added).) Gray was asked whether USA Fencing asked her to change any portion of this narrative. She testified that she "did not remember if it was that [the form] was blank or there was a formatting issue or something like that," but, in any event, she "did not remember exactly what the specifics were." (*Id.* at 60.) The only thing she specifically remembered being asked to change was the designation of the misconduct from sexual to physical. (*Id.* at 60–61.)

Gray also testified that her complaint was resolved by USA Fencing's having a second telephone call with her in which they "discussed the events of [her] report" and USA Fencing's sending "a letter to [Piraino] saying don't do that." (*Id.* at 71.) Gray believes her second phone call took place on March 3, 2017 with USA Fencing's then-CEO, Kris Ekeren, and then-SafeSport Coordinator, Suzie Riewald. (*Id.* at 73–74.) Asked whether she told Ekeren and Riewald anything different from what was in her report, Gray stated that she "remember[ed] clearly expressing that [Piraino] touched [her] inappropriately, that he touched . . . the breast area of [her] jacket, [her] clothing." (*Id.* at 77.) Asked to specify whether she told them that he touched her breast or the area near her breast, Gray replied that the event was eight years ago and she did not recall precisely but that, irrespective of whether she said that he touched her breast or touched near her breast, she was certain that she had clearly communicated that Piraino had touched her inappropriately. (*Id.*) She felt that Ekeren and Riewald were dismissive and "not support[ive]." (*Id.* at 74.)

According to USA Fencing, at the time Gray's report was received on February 27, 2017, the U.S. Center for SafeSport had not taken jurisdiction over any NGBs and would not begin accepting reports from USA Fencing until August 1, 2017. The plaintiffs dispute this contention for the reasons stated above. They also maintain that, under the SafeSport Code, all complaints after March 3, 2017 had to be referred to SafeSport for its "exclusive authority over . . . actual or suspected sexual misconduct" and that NGBs like USA Fencing should investigate any such complaints. (Doc. No. 155-2 at 30, 61.) The SafeSport Code defines "sexual conduct" to include "any intentional bodily contact, however slight, whether clothed or unclothed, of a person's . . . breast." (Doc. No. 155-2 at 79.)

## IV. DISCUSSION

USA Fencing moves for summary judgment on the grounds that there are no material factual disputes and the plaintiffs cannot as a matter of law prove negligence or negligent

supervision on the part of USA Fencing. In its Memorandum in support of its motion, it argues that (1) it did not have a duty to protect Jane Doe from Piraino's misconduct under the circumstances presented here; (2) even if it had such a duty, it did not breach that duty; (3) it is not vicariously liable for Piraino's criminal conduct; (4) it cannot be liable for Piraino's criminal conduct because it did not have actual or constructive notice of that conduct; and (5) punitive damages are not warranted in this case, based on the undisputed facts.

The plaintiffs point out in their Response that they have never asserted a vicarious liability claim against USA Fencing. (Doc. No. 155 at 18 n.3.) The court agrees and will not address the issue further. The court addresses the parties' other arguments below.

### A. Legal Standards

It is well established that, in Tennessee, a negligence claim requires proof of each of the following elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate or legal cause." *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 819 (Tenn. 2008) (quoting *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005)).

Tennessee courts generally recognize the negligence of an employer in the selection and retention of employees and independent contractors. *Doe v. Cath. Bishop for Diocese of Memphis*, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008) (citations omitted). A plaintiff may recover for negligent supervision if he establishes, in addition to the elements of a negligence claim, that the employer had knowledge of the employee's unfitness for the job. *Id.* (citation omitted).

With respect to the first element of a negligence claim, "duty" means "a legal obligation to conform to a reasonable person standard of care in order to protect others against unreasonable risks of harm." *Cullum v. McCool*, 432 S.W.3d 829, 833 (Tenn. 2013) (quoting *Satterfield v.*

*Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008)). "An unreasonable risk of harm arises and creates a legal duty if the foreseeability and gravity of harm caused by a defendant's conduct outweighs the burdens placed on a defendant to engage in other conduct that would prevent such harm." *Id.* (citing *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)).

In Tennessee, "there is no duty to protect others against risks of harm by third parties" unless "a special relationship exists between the defendant and either the person at risk or the actor who is the source of the risk or danger." *Ms. B. v. Boys & Girls Club of Middle Tenn.*, No. M2013-00812-COA-R3CV, 2014 WL 890892, at *4 (Tenn. Ct. App. Mar. 6, 2014) (citation omitted). Thus, "if an individual stands in a special relationship to another individual who is the source of the danger or who is foreseeably at risk from the danger, then the individual assumes an affirmative duty to exercise reasonable care to either control the danger or protect the vulnerable." *Downs*, 263 S.W.3d at 819 (citations omitted). Some well-recognized special relationships that may give rise to an affirmative duty to exercise reasonable care include the relationship between business owner and patron, guest and innkeeper, passenger and common carrier, landowner and guest, and host and guest. *Ms. B*, 2014 WL 890892, at *5 (citations omitted).

"Tennessee courts determine whether a defendant owes or assumes a duty of care to a particular plaintiff by considering public policy and whether the risk of harm is unreasonable." *Downs*, 263 S.W.3d at 820. "'[A] risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *Id.* (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). Additional factors to be considered in deciding whether a risk is unreasonable include:

> the foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity

> engaged in by defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct.

*Id.* (quoting *McCall*, 913 S.W.2d at 153). "Whether a defendant owed or assumed a duty of care to a plaintiff is a question of law for the court to decide." *Id.*

To prove breach of an existing duty, a plaintiff must show that the defendant failed to exercise reasonable care under the circumstances. *Kellner v. Budget Car & Truck Rental, Inc.*, 359 F.3d 399, 404 (6th Cir. 2004) (applying Tennessee law). The standard of conduct is always the same in a negligence action; it is a "standard of reasonable care in light of the apparent risk." *Id.* (citing *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 428 (Tenn. 1994); *Bradshaw v. Daniel*, 854 S.W.2d 865, 870 (Tenn. 1993)). That is, under Tennessee law, "[a]ll persons have a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others." *Bradshaw*, 854 S.W.2d at 870. A defendant that does not exercise reasonable care breaches that duty. *Doe v. Linder Const. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992).

### B.    Existence of a Duty

USA Fencing initially contends in its opening Memorandum in support of its Motion for Summary Judgment that it did not have a "special relationship" with Jane Doe, and therefore no duty to protect her from Piraino's conduct, because it "did not retain, employ, instruct, control, supervise or monitor Piraino's day-to-day activities" and did not "have the ability to reasonably do so." (Doc. No. 144-1 at 13.) In its Reply brief, however, USA Fencing expressly "acknowledges," at least for purposes of summary judgment, "its duty to minor athletes and its special relationship with Jane Doe and Piraino." (Doc. No. 161 at 2.) Based on this prudent concession and in light of the applicable legal standard, the court accepts that USA Fencing owed a duty of care to Jane Doe.

C.     **Breach of Duty**

USA Fencing argues further that, even if it had a duty, it did not breach any such duty, as it "implemented appropriate safeguards and undertook reasonable efforts to educate coach members about child abuse in order to minimize the risk of abuse." (Doc. No. 144-1 at 14; Doc. No. 161 at 2.)

The plaintiffs respond that USA Fencing mishandled the 2017 complaint from Katherine Gray and that "failing to respond to a prior complaint of sexual misconduct is the archetypal example of negligence in sex abuse cases." (Doc. No. 155 at 19 (citing *Golden Spread Council v. Akins*, 926 S.W.2d 287, 290 (Tex. 1996)).) They charge USA Fencing with being "dismissive" of Gray's report, asking her to change its characterization from "sexual" to "physical," and failing to take any action in response other than calling Piraino. They argue that, although USA Fencing attempted to send a warning letter to Piraino by email, Piraino testified that he never received it and that it appears to have been sent to an email address he no longer used. (*See* Andrews Rule 30(b)(6) Dep. 25–26.) And they argue that USA Fencing even now "mischaracterizes the evidence" and disregards Gray's testimony that Piraino, in fact, touched her breast and not merely the area near her breast. (Doc. No. 155 at 20.) The plaintiffs further contend that "[t]he surrounding circumstances further support [Gray's] narrative and suggest that USA Fencing was actively trying to cover up her complaint." (*Id.*) In particular, the plaintiffs take issue with USA Fencing's failure to submit Gray's complaint to SafeSport, given that, according to the plaintiffs, SafeSport had jurisdiction over all such complaints beginning March 3, 2017, immediately after the event at issue occurred. They contend that, if the incident was characterized as merely "physical" rather than "sexual," USA Fencing could keep the complaint "in house" and would not be required to forward it to SafeSport for investigation and resolution. (*Id.* at 21–22.) They contend that "a reasonable jury could find that the desire to shield the complaint from SafeSport scrutiny best explains USA

Fencing's conduct in pressuring [Gray] to describe the abuse as physical rather than sexual." (*Id.* at 22.)

In fact, even if the court accepts as true Gray's testimony, eight years after the event, that Piraino actually touched her breast(s), nothing in the record would permit a reasonable jury to conclude that she *reported to USA Fencing* that Piraino touched her breast—rather than simply her jacket lapel in the "area" near her breast.[12] Her email to Piraino two days after the event said "area near my breast." (Gray Dep. 44.) Her written report to USA Fencing said "in the area near my breasts." (*Id.* at 58.) The plaintiffs' suggestion that USA Fencing somehow changed Gray's report or persuaded her to change it to say he touched the "area near her breast" rather than simply that he touched her breast(s) is not supported by Gray's testimony.

And even assuming that USA Fencing "pressured" Gray to change her characterization of the event from "sexual" to "physical"—which is not actually supported by Gray's testimony—it is unclear why this would have made a difference. To characterize Piraino's act of touching Gray on her sternum, on top of her jacket, as sexual misconduct would make a mockery of conduct that actually qualifies as sexual misconduct. Certainly, his gesture was inappropriate, but, even accepting as true Gray's testimony, USA Fencing was not unreasonable in believing that the

---

[12] Later in her deposition, asked to explain the discrepancy between her now saying Piraino had "touched [her] breasts, plural" and her having reported that he touched her "near [her] breast in February of 2017," Gray explained, "I think the area near my breast, when I spoke of that, I know what I was referring to. And I know that it was this area right here, the area in line with my nipples, center of my breast on a very tight-fitting piece of clothing where you could not touch me without being inappropriate. Whether you want to say that the area near my breasts and touching my breasts are not synonymous in that case, I don't necessarily know that I am comfortable making that call." (Gray Dep. 87–88.) Gray appears to be saying that Piraino touched her on her sternum, on the zipper of her jacket, between her breasts. (*See also* Gray Dep. at 69 (confirming that he touched the "zipper area").)

incident constituted inappropriate physical misconduct rather than inappropriate sexual misconduct.

Likewise, the court is not persuaded that there is a material question of fact regarding whether USA Fencing should have referred the incident to the U.S. Center for SafeSport as a sexual misconduct complaint. The plaintiffs agree that the Center took jurisdiction of sexual misconduct complaints beginning March 3, 2017. The incident involving Piraino and Gray took place on February 25, 2017 and was reported to USA Fencing on February 28, 2017. (Gray Dep. 39, 46.) In other words, there is no dispute that the incident took place and was reported to USA Fencing prior to March 3, 2017. The plaintiffs do not explain why the Center would have had any authority to investigate incidents that took place prior to the effective date of the SafeSport program.

Regardless, the question of USA Fencing's handling of the incident involving Gray is relevant only insofar as it has some bearing on USA Fencing's breach of a duty *to Jane Doe*. In other words, did the incident make his misconduct with Jane Doe foreseeable? As the Tennessee Supreme Court has stated, "in general terms, '[f]oreseeability is the test of negligence.'" *Downs*, 263 S.W.3d at 820 (quoting *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 552 (Tenn. 2005)). "'A risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable.'" *Id.* (quoting *West*, 172 S.W.3d at 552). A single incident involving the touching of an adult woman that was not obviously sexual, in a public setting, in full view of other people, would not have made it reasonably foreseeable to USA Fencing that Piraino would engage in inappropriate, clandestine sexual communications with a minor.

The plaintiff attempts to avoid this result, citing *Lopez v. Metropolitan Government of Nashville & Davidson County*, 646 F. Supp. 2d 891 (M.D. Tenn. 2009), for the proposition that reasonable foreseeability is a jury question. In that case, a disabled minor male child was sexually assaulted on a school by another male student ten years his senior, and the question was whether Metro Nashville should have foreseen and prevented the assault. The assailant in that case, however, had a lengthy and well documented history of sexual misconduct, typically—but not always—involving "consenting, age-appropriate females." *Id.* at 919. The assailant, however, had also exposed himself to another young boy on the bus and threatened to "do it" to the "new kid," giving rise to substantial "alarm" on the part of school administrators about the fact that the assailant's more recent contact had involved younger students. *Id.* at 916, 919. The court concluded that this was sufficient to permit a reasonable jury to conclude that the defendants "were on notice that there was a reasonable probability that [the assailant] would sexually assault [the plaintiff's child]." *Id.* at 919. That case is not remotely similar to the present case.

The plaintiffs' second argument is that USA Fencing had a duty to "adopt and implement reasonable policies and procedures to prevent and detect sexual abuse" and that it breached that duty "as to Piraino because the policies and procedures that [USA Fencing] put in place created a system where [Piraino] was in charge of USA Fencing's operations in an entire state with little-to-no monitoring or accountability." (Doc. No. 155 at 24.) That is, they assert that "USA Fencing breached the standard of care by vesting total authority over one of its divisions in an unvetted volunteer, and that this breach increased the risk that an athlete like Jane Doe would be sexually abused." (*Id.* at 26.) In support of this argument, the plaintiffs point to a statement by one of the coaches who worked at Music City Fencing, Zeno Doeleman, who thought that Piraino's training methods were too harsh but did not report him to anyone. Doeleman testified that Piraino was a

"good manipulator" and had created an environment in which he exercised complete control, but he never heard Piraino make inappropriate comments about minors. (Doc. No. 150-10, Doeleman Dep. 102–05, 69.) Another coach, Martin Lang, testified that he heard Piraino make inappropriate comments about minors in his presence on occasion when Piraino was hanging out with one particular friend, but Lang could not be specific about what he had heard, and he never reported the comments to anyone else. (Doc. No. 150-6, Lang Dep. 34–39.) Finally, the plaintiffs point to Jane Doe's mother's testimony that she had heard unsubstantiated rumors from another fencer's mother, who advised not to leave her children alone with Piraino and reported having seen Piraino giving alcohol to underage fencers and touching them inappropriately at a party. (Judy Doe Dep, Doc. No. 150-13 at 93–94.) Judy Doe did not act on or report these rumors to anyone.

The evidence to which the plaintiffs point, again, does not substantiate the suggestion that USA Fencing had actual or constructive knowledge about Piraino's conduct generally or rumors about his conduct. Moreover, as set forth above, it is undisputed that USA Fencing had in place policies and procedures to prevent and detect child abuse. It is undisputed that USA Fencing had adopted SafeSport/MAAPP policies, conducted background checks, and required training for adult participants (including coaches) who interacted with minor athletes. Piraino and his coach employees were subject to these rules and trainings beginning no later than 2018, well before Piraino's misconduct with Jane Doe began. The plaintiffs point to no evidence suggesting that these policies were insufficient, that USA Fencing knew or should have known that Piraino and Music City Fencing were not abiding by the applicable policies, or that USA Fencing could or should have done something more to prevent conduct like Piraino's from taking place or to make it easier to detect.

More to the point, virtually all of Piraino's actionable misconduct with Jane Doe involved clandestine electronic communications that Jane Doe took great pains to conceal even from her parents. The plaintiffs do not suggest how USA Fencing had the ability to monitor Piraino's private electronic communications with a minor student, aside from establishing clear rules prohibiting that conduct, making sure the parents of minor athletes knew the rules, and offering training to parents and athletes as well—all of which it did.

There is, in short, no evidence in the record from which a reasonable jury could conclude that USA Fencing breached its duty of care to Jane Doe. It is entitled to summary judgment on the negligence claim and the negligent supervision claim as well.

### D.     Punitive Damages

Because the plaintiffs cannot establish USA Fencing's negligence, they will not be entitled to damages from USA Fencing, including punitive damages. Moreover, even if summary judgment on the negligence claims were not warranted, there is no evidence from which a reasonable jury could find that USA Fencing acted "(1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly," as required under Tennessee law to justify a punitive damages award. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). USA Fencing is entitled to summary judgment on this issue as well.

## V.     CONCLUSION

For the reasons set forth herein, USA Fencing's Motion for Summary Judgment (Doc. No. 144) will be granted in its entirety, and all claims against USA Fencing will be dismissed. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge